**H. Seymour COLTON and Ruth W. Colton, Plaintiffs,**

v.

**Parker C. WILLIAMS and Melvin J. Burton, Defendants.**

**Nos. 36670, 36671.**

United States District Court
N. D. Ohio, E. D.

July 25, 1962.

James I. Huston, Cleveland, Ohio, for plaintiffs.

Bruno Lederer, Tax Division, Dept. of Justice, Washington, D. C., for defendants.

CONNELL, Chief Judge.

These are cases brought by the taxpayers for the refund of certain taxes alleged to have been wrongfully assessed and collected. For convenience, the taxpayers will be referred to as plaintiff or simply taxpayer; Ruth W. Colton is present as the second party on a joint return. The defendants, Collectors of Internal Revenue, will be referred to as the Government. Jurisdiction under Titles 26 and 28, United States Code, is not disputed.

The facts in this case are rather involved and are contained in a lengthy stipulation filed with this Court. It is believed that the following summary is sufficient to frame the legal question now before us. It is also the opinion of this Court that there are only two significant areas of factual dispute which will be indicated at the appropriate point.

In 1943, the taxpayer and other individuals formed a corporation for the manufacture of chemical products. Until 1951, the taxpayer was the majority shareholder and until 1954, he was the president and chief executive officer. From the foundation of the Company until June, 1951, the Company alternated between a policy of small salaries plus a percentage of profits and a policy of straight salary for its officers. In that month, the salary plus bonus method was continued for two other officers, but plaintiff was granted an option to purchase shares of the Company, "in addition to the regular salary, but in lieu of all present incentive payments." In December of 1951, plaintiff agreed to accept the option here in dispute in lieu of the June option. The December option gave the taxpayer the right to purchase 40,000 shares at a price of $3.25 per share, thereafter increasing annually at a rate of $.25 per year to the price of $4.00, the offer to expire December 31,

1956. In October, 1951, 80,000 shares of the common stock of the Company had been offered and sold to the public at $3.00 per share.

The taxpayer failed to report the receipt of the option as income for the year of 1951; nor did the Company include the item on its report as an expense. On later disposition of the options, the taxpayer claimed capital gain treatment, while the Government contends that the tax is to be imposed in the year that the gain was realized and that the entire amount is to be treated as ordinary income. Thus, the issue as both parties state it is whether the receipt of the stock option in 1951 constituted taxable income at that time.

The first area of factual dispute involves the intent of the parties to the granting of the option, the Company and the taxpayer. It seems too obvious to mention that in the ordinary sense of the words the parties, and especially the taxpayer, viewed the option as a thing of value in itself. Why else would he relinquish his share of the prospective profits in return for it? That it was in the nature of compensation is not denied by either party.

However, the Government points to the fact that the granting of the option was not reported by either the Company or the taxpayer as a matter of compensation. The inference we are urged to draw from this is that the parties to the transaction could not have intended a present compensation. The plaintiff meets this sufficiently we believe by his explanation that he was only following the advice of his attorney in failing to so report it, because of the confused state of the law at that time. There is independent evidence of this confusion in a case much like the present one, wherein the taxpayer prevailed in his contention that an option constituted income in the year of receipt, rather than the year of its exercise. In that case, the taxpayer had attempted to include in his income for the year his valuation of the option at the time of its granting.

"The fact that the Commissioner disallowed this deduction by National and said that the additional income as reported by petitioner was not income to him, does not prevent this action by National and the petitioner from disclosing their intentions." McNamara v. Commissioner, 210 F.2d 505, 507–508 (7 Cir. 1954).

Admittedly, the case for the taxpayer herein would be stronger if he had attempted to include the value of the option in his income for the year of 1951. But, if the Government had held then to their present position, we would be requiring an act useless in itself in order to establish an intent for this case, an intent which we believe is amply demonstrated by other facts in this case. We are not referred to any authority for the proposition that such a formal notice of intention to compensate is necessary to qualify for capital gain treatment upon exercise or sale of the option. Absent such authority, we conceive the reporting vel non of the granting of the option as income is only evidentiary of the ultimate fact of intention to compensate.

■ A second element of intention to compensate found in the case law on the point is that of the time at which the compensation is intended to occur, e. g. Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830 (1945). The general rule is that there can be no income unless the option itself has a value. The income which will be the basis for the prospective capital gain treatment must be attributable to the year in which the option is granted. It would seem implicit in the cases that the determination of the value of the option depends upon whether the option price exceeds the market price or not. The rationale is simple. If a stock has a fair market price of $3.00, then an option to buy at $2.98 has value, while one to buy at $3.01 had none. The former is includible in gross income; the latter is not. Most importantly, five years later when the two options are exercised or sold and the price of the stock

may have risen to $50.00 a share, the former qualifies for capital gain treatment, while the latter is subject to taxation as ordinary income. This gross disparity results because an option to buy at a price greater than the market price has no present "value" and, therefore, cannot be intended to be present compensation. This view ignores every other indicator of worth or intention except that of option price and current market price. Because of our findings in this case, we are not obliged to meet this rationale head-on. We only criticize it in passing, for we do find an intention to presently compensate, which is not vitiated by the stock's later phenomenal growth in value. Once the stringent requirements of the "present value" rule (supra) are met, it would seem irrelevant that the parties contemplate such an increase in the value of the stock that the largest part of the compensation in fact occurs in years afterward. There seems to be no difference in this aspect from an outright granting of stock, whose foreseeable growth is not reflected in the amount recorded as ordinary income and that eligible for the more favorable capital gains treatment.

■ This second element of intention to compensate, i. e. the intention to *presently* compensate, tends inevitably to a consideration of the only other factual dispute, that of whether the option has a "value" at the time of its granting. As the cases and the previous discussion indicate, the question of "value" depends upon the market price exceeding the option price. At the outset we are faced with the fact that there was a public offering practically contemporaneous with the granting of the option and that the price per share was $3.00 at a time when the option price was $3.25. In rebuttal of the possible inference to be drawn from this, there was testimony that the offering was oversubscribed and that the value was actually $3.75. Indeed, the offering was two months previous to the option, it was twice as large as the option, and the fact of the oversubscription indicates that a higher price could conceivably be demanded. It is a matter of public knowledge that the per share price of a large offering will be lowered to facilitate a quick disposition.

■ As a matter of affirmative proof of the value of the option at the time of its granting, the plaintiff offered the testimony of a reputable experienced stock broker, Mr. Cunningham, who possessed the additional qualification of close familiarity with the stock in question. He was the managing underwriter of the 1951 public offering. After evaluating the fair market price of the stock at $3.75 per share on December 1, 1951, he went on to ascribe a value of $1.00 per share on the option, based on the $.50 per share difference between market price and option price and a factor known as a percentage "lead" because of the option privilege. In view of the tight line drawn in previous cases in determining whether an option has present value, we would be inclined to believe that the question of the value of the option is determined only by a comparison between option price and market price, and that the value of the option cannot include, under the present law, any factor such as percentage lead, however real the factor is in the world of stock.

■ We do find the evidence convincing that the stock had a market price $.50 in excess of the option price, and that therefore, the option had a "value" includible in gross income in the year of its granting, 1951, of at least this $.50.

Moreover, Treasury Regulation § 1.421–6(c) (3) (ii) provides that the fair market value of an option includes the value attributable to the option privilege irrespective of whether there is a right to make an immediate bargain purchase. We are not presently concerned with whether this provision dispenses with the present value theory (supra). We cite the section to support our finding that the option at the time of its granting had a value per share of $1.00, which includes the factor of percentage "lead."

The Government repeatedly calls our attention to this Treasury Regulation,

and insists that the option has no value includible in income for the year of 1951 because it does not have a readily ascertainable fair market value. It is quite true as the plaintiff contends that the Regulation does not find specific support in the case law in all its particularities, but we do not find it necessary to express a disinclination to follow the Regulation. The option under consideration appears to conform to a reasonable interpretation of the conditions imposed by the Regulation.

First, we note that there is no requirement that the stock be actively traded on an established market, indicating, it would seem, that the benefits of the section are not to be limited to the larger corporations. Under Section 1.421–6(c) (3) (i), the sole requirement is that the option have a readily ascertainable fair market value, which means that it can be measured with reasonable accuracy. Now, unless the previous dispensation that the stock need not be actively traded on an exchange means nothing, there would appear to be no other reliable means of proof except the sort of testimony heard in this trial. We have the objective fact that the taxpayer was to receive this option "in lieu of all present incentive payments." In addition, there was the evidence of the successful public offering. Finally, there was the expert testimony of an informed broker. More evidence would border on being merely cumulative, especially when any evidence against the fact of the option having a value was absent.

Therefore, consequent to our finding that the option had value and was income in the year of 1951, we find that Regulation 1.421–6 supports the position of the plaintiff taxpayer.

■ There remains only one matter for decision, and it seems to follow without dispute after the previous findings. That part of Regulation 1.421–6 which deals with the transfer of options without a readily ascertainable fair market value is clearly inapplicable to the transfer by the taxpayer to the trust for his daughters. The transfer itself to the trustee would be tax-free transaction with regard to the present taxpayer.

Therefore, judgment shall be entered for the plaintiff in accordance with Stipulation No. 44, as agreed by the parties.