**M. P. FRANK and Beatrice Frank, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 18582.**

United States Court of Appeals, Seventh Circuit.

June 14, 1971.

Rehearing Denied, Sept. 29, 1971.

Pell, Circuit Judge, dissented and filed opinion.

Marvin E. Klitsner, William J. Willis, Timothy C. Frautschi, Milwaukee, Wis., for appellants; Foley & Lardner, Milwaukee, Wis., of counsel.

Johnnie M. Walters, Asst. Atty. Gen., Tax Division, Daniel B. Rosenbaum, Joseph M. Howard, Harry Baum, Attys., Tax Division, Dept. of Justice, Washington, D. C., for appellee.

Before SWYGERT, Chief Judge, and FAIRCHILD and PELL, Circuit Judges.

SWYGERT, Chief Judge.

This is a petition to review a decision of the United States Tax Court[1] which determined deficiencies in the federal income taxes for calendar year 1960 paid by petitioners-appellants.[2] The Tax Court determined that taxpayer realized ordinary income in the amount of $530,328.66 during that year due to the exercise on September 28, 1960 of stock options granted in 1958 to M. P. Frank by Mortgage Guaranty Insurance Company ("MGIC") and Guaranty Insurance Agency, Inc. ("GIAI"), both Wisconsin corporations. Taxpayer appeals the de-

---

1. M. P. Frank, 54 T.C. 75 (1970).

2. M. P. Frank and Beatrice Frank filed a joint individual income tax return for the calendar year here in question as husband and wife. Otherwise, Beatrice Frank has no connection with these matters, and the term "taxpayer," which is sometimes used hereinafter, refers to M. P. Frank.

terminations of the Tax Court that: (1) M. P. Frank was an employee of both corporations, and the options were granted by reason of such employment; (2) the options did not have a readily ascertainable market value at the time they were granted; (3) the stock subject to the options was not subject to any restriction which had a significant effect upon its value within the intendment of Treasury Regulations, § 1.421–6(d) (2) (i), so as to preclude taxation of any gain at the time of exercise of the options; and (4) the stock underlying the options had a fair market value of $18.50 per adjusted share[3] at the time of exercise of the options. We affirm the decision of the Tax Court in all respects.

The facts relevant to a determination of this review are recited in meticulous detail in the opinion of the Tax Court,[4] and the statement of facts which follows is only so much as is necessary to understand our disposition of this review. In 1956 taxpayer and two others organized and promoted a Wisconsin corporation under the name of Mortgage Guaranty Insurance Corporation for the purpose of engaging in the business of insuring mortgagees against losses on residential first-mortgage loans. Prior to incorporation, the incorporators adopted a resolution that, in return for their activities (then uncompleted) in organizing the corporation and promoting the sale of the original issuance of stock, the promoters, including taxpayer, would receive an option to purchase 100 shares of stock of MGIC at any time prior to December 31, 1959 for $500 per share, $25 less than the issue price.

In 1957 the organizers and promoters of MGIC also organized and promoted a second Wisconsin corporation under the name of Guaranty Insurance Agency, Inc., for the purpose of selling insurance issued by MGIC and financing the payment of commissions. On January 9, 1957 taxpayer was elected to the board of directors of MGIC and was also made its first secretary-treasurer. On May 6, 1957 he was elected to the GIAI board, and on May 23, 1957 he became GIAI's first president. Also in 1957 MGIC executed a four-for-one stock split, and the original issue of GIAI stock was distributed to MGIC shareholders at a ratio of one share of GIAI per four shares of MGIC stock held at a price of $25 per share.

Then in 1958, and before any of the three promoters had exercised their 1956 MGIC options, the boards of MGIC and GIAI adopted similar resolutions granting options to taxpayer and the other two promoters to purchase 400 shares at $125 per share and 100 shares at $25 per share, respectively, at any time up to December 31, 1962. In mid-1959 both MGIC and GIAI split their stock eight-for-one, and early in 1960 the 1958 options granted to taxpayer by MGIC and GIAI were revised to reflect the stock splits. Other stock splits occurred before taxpayer's exercise of the options which were taken into account upon exercise of the options, although no other amendments were made to the options themselves.

■ Initially, we note that the scope of our review of the trial court's decision is circumscribed by the proposition that we may reverse findings of fact by the Tax Court only if they are clearly erroneous.[5] That being the case, we conclude that there is sufficiently substantial evidence stated in the opinion of the Tax Court to justify its determinations that taxpayer was an employee of MGIC and GIAI, that both cor-

---

3. At the time of the exercise of the options, MGIC stock and GIAI stock were sold in units consisting of four shares of MGIC and one share of GIAI. The $18.50 per adjusted share value, therefore, refers to the combined value of one share of MGIC stock and one-quarter share of GIAI stock, adjusted to reflect all stock splits occurring between the date of the granting of the options and the date of their exercise.

4. M. P. Frank, 54 T.C. 75, 76–85 (1970).

5. Commissioner v. Duberstein, 363 U.S. 278, 290–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

porations granted the options here in question by reason of such employment, and that the stock underlying the options had a fair market value of $18.50 per adjusted share on September 28, 1960 when the options were exercised. Accordingly, we affirm those determinations without further comment.

■ As to the determination that the stock subject to the options had no readily ascertainable market value at the time of the granting of the options, we believe we are similarly bound by *Duberstein* to the clearly erroneous standard. However, because of the importance placed upon that issue by the taxpayer, we are impelled to discuss that issue in spite of the Tax Court's extensive discussion of it.[6]

Taxpayer contends that the granting of the options to taxpayer in 1958 is the taxable event, if any there be, deriving from the options. He asserts that the stock underlying the options and the options themselves could be valued at the date of granting, and any income taxable to taxpayer must be calculated on the basis of the value of the options at grant. We disagree.

In Commissioner v. LoBue,[7] the Supreme Court held that a compensatory, nontransferable stock option granted by a corporation to an employee generated income to the employee which was taxable at exercise. The Court stated:

> It is of course possible for the recipient of a stock option to realize an immediate taxable gain [*i. e.*, at grant].
> * * * The option might have a readily ascertainable market value and the recipient might be free to sell his option.[8]

That statement led by negative implication to the adoption of Treasury Regulations, § 1.421–6,[9] which incorporates the readily ascertainable standard. Section

1.421–6(c) (3) (ii) of the regulations provides:

> [T]he fair market value of the option is not readily ascertainable unless the value of the option privilege can be measured with reasonable accuracy. In determining whether the value of the option privilege is readily ascertainable, and in determining the amount of such value when such value is readily ascertainable, it is necessary to consider—
>
> > (a) Whether the value of the property subject to the option can be ascertained;
> >
> > (b) The probability of any ascertainable value of such property increasing or decreasing.

The Tax Court held that the options did not have a readily acertainable fair market value at grant, noting that there was conflicting evidence as to whether the underlying stock could be valued and preferring to believe the evidence tending to establish that it could not.[10] The determination of the Tax Court that "the fair market value of the stock here involved, and the probability that such stock would increase or decrease in value could not be ascertained with reasonable accuracy"[11] is clearly correct. The stock of MGIC and GIAI had been the subject of only a few isolated sales to third parties when the options were granted, and there was no market price then available. Indeed, taxpayer's expert seems to have relied exclusively on the issue price of the stock as the base from which he attempted to determine the value of the options. Moreover, the customary method of using "comparables"—stocks of similar businesses which are publicly traded—to ascertain the value of a closely held corporation's stock could not be used here because MGIC and GIAI were unique in that no other private businesses in the country were involved in a similar enterprise. In ad-

---

6. M. P. Frank, 54 T.C. 75, 89–92 (1970).

7. 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956).

8. *Id.* at 249, 76 S.Ct. at 804.

9. T.D. 6540, 1961–1 Cum.Bull. 161.

10. M. P. Frank, 54 T.C. 75, 90–92 (1970).

11. *Id.* at 92.

dition, MGIC had been in business less than two years, had suffered a net loss of $53,283.14 during 1957 and was to suffer a net loss of $15,770.00 during 1958. GIAI was also a new business and suffered a net loss of $26,722.00 in 1958. Nor has anyone contended that book value has any relation to the fair market value of these stocks. It is clear, therefore, that the stock underlying the options could have no "readily ascertainable market value" as envisioned by the Supreme Court in *LoBue*.

Taxpayer contends in the alternative that, assuming the options were compensatory and had no readily ascertainable market value at grant, he is not required to recognize any income at the date of exercise because the stock underlying the options was subject to a restriction which had a significant effect on its value within the meaning of Treasury Regulations, § 1.421–6(d) (2) (i). Taxpayer asserts as alternative bases for this contention the following facts: (1) the stock was not registered with the Securities and Exchange Commission, and taxpayer would suffer limitations on the types and amounts of possible dispositions deriving from the lack of registration and his position as an insider with the corporation; (2) registration of taxpayer's shares with the SEC would be unreasonably expensive when viewed with regard to the number and value of shares involved; (3) registration was probably not possible in any event, "since the company was new, struggling and a public offering would look like a 'bail-out' to the investing public;" (4) redemption of the shares was not possible because the company was suffering liquidity problems; (5) stock sold by taxpayer would have to be sold subject to investment letter restrictions on the purchaser. In support of his position, taxpayer cites *Ira Hirsch*, 51 T.C. 121 (1968), as standing for the proposition that restrictions on the transfer of stock deriving from the operation of the Securities Act of 1933 constitute

restrictions having a significant effect on the value of stock within the intendment of the regulation. We agree with the taxpayer that *Ira Hirsch* is indistinguishable from this case on that point, in spite of the trial court's efforts to distinguish it.[12] We believe, however, that *Ira Hirsch* was wrongly decided on this issue, and we decline to follow it.

*Ira Hirsch* involved the taxability at exercise of the receipt of compensatory stock options relating to stock in a closely held corporation. The stock subject to the option was issued pursuant to a regulation A exemption from registration.[13] The SEC took the position that any sale by Hirsch without prior registration of the stock obtained pursuant to the option would constitute a violation of the Securities Act of 1933. The Tax Court found in *Hirsch* that the foregoing restriction on transfer deriving from the operation of the Securities Act of 1933 constituted the type of restriction contemplated in Treasury Regulations, § 1.-421–6(d) (2) (i), and recognition of any income deriving from Hirsch's exercise of the options was deferred.[14]

■ We believe the Tax Court's decision in *Ira Hirsch* is erroneous in that we do not believe restrictions on transferability arising by operation of securities law were intended to be included within the meaning of the applicable Treasury Regulation. Rather, the purpose of the regulation was to defer taxation on exercise of options only where the underlying stock was subject to a contractual limitation which prevented the sale of the stock at its fair market value. In *Hirsch* the Tax Court makes no mention of Treasury Regulations, § 1.421–6(d) (2) (ii), which contains examples of the operation of section 1.-421–6(d) (2) (i) and provides:

The provisions of subdivision (i) of this subparagraph may be illustrated by the following examples:

*Example (1)*. On November 1, 1959, X Corporation grants to E, an

12. M. P. Frank, 54 T.C. 75, 96 (1970).

13. 17 C.F.R. §§ 230.251–.263 (1970).

14. Ira Hirsch, 51 T.C. 121, 135–137 (1968).

employee, an option to purchase 100 shares of X Corporation stock at $10 per share. Under the terms of the option, E will be subject to a binding commitment to resell the stock to X Corporation at the price he paid for it in the event that his employment terminates within 2 years after he acquires the stock, for any reason except his death. Evidence of this commitment will be stamped on the face of E's stock certificate. E exercises the option and acquires the stock at a time when the stock, determined without regard to the restriction, has a fair market value of $18 per share. Two years after he acquires the stock, at which time the stock has a fair market value of $30 per share, E is still employed by X Corporation. E realizes compensation upon the expiration of the 2-year restriction and the amount of the compensation is $800. The $800 represents the difference between the amount paid for the stock ($1,000) and the fair market value of the stock (determined without regard to the restriction) at the time of its acquisition ($1,800), since such value is less than the fair market value of the stock at the time the restriction lapsed ($3,000).

*Example (2).* Assume, in example (1), that E dies one year after he acquires the stock, at which time the stock has a fair market value of $25 per share. Since the restriction lapses upon E's death, he realizes compensation of $800 ($1,800 less $1,000) and this amount is includible in E's gross income for the taxable year closing with his death.

*Example (3).* Assume that, pursuant to the exercise of an option not having a readily ascertainable fair market value to which this section applies, an employee acquires stock subject to the sole condition that, if he desires to dispose of such stock during the period of his employment, he is obligated to offer to sell the stock to his employer at its fair market value at the time of such sale. Since this condition is not a restriction which has a significant effect on value, the employee realizes compensation upon acquisition of the stock.

*Example (4).* Assume, in example (3), that the employee is obligated to offer to sell the stock to his employer at its book value rather than at its fair market value. Since this condition amounts to a restriction which has a significant effect on value, the employee does not realize compensation upon acquisition of the stock, but he does realize such compensation upon the lapse of the restriction, such as, for example, his death or the termination of his employment.

We note that each of the four examples contained in the regulation are of the same genre—all which deferred taxation are contractual limitations which prevented the sale of the stock at its fair market value until the limitation lapsed or was otherwise lifted. Moreover, in Revenue Ruling 68–286[15] the Commissioner advised that the fact that section 16(b) of the Securities Exchange Act of 1934 made a taxpayer liable as an insider to the corporation for profit realized on a sale of stock within six months of its acquisition did not amount to "a restriction which has a significant effect on [the stock's] value" within the meaning of Treasury Regulations, § 1.-421–6(d) (2) (i). By the same token, the way in which the instant taxpayer is restricted as to the manner in which he may sell his stock by the threat of violating the Securities Act of 1933 is not sufficient in our view to constitute the type of restriction contemplated by the regulation.

In addition, some of the reasons taxpayer has asserted as supporting the proposition that his stock is restricted so as to require deferral of taxation sound in the nature of blockage. Since we here hold that the restrictions to which reference is made in section 1.-

---

15. 1966–1 Cum.Bull. 185.

421–6(d) (2) (i) are only limitations of a contractual nature which prevent the sale of the stock at its fair market value, it is obvious that the element of blockage is insufficient to defer recognition of income under the regulation.

■ Finally, taxpayer asserts that if the option was compensatory then the income derived therefrom *must* be taxed upon receipt of the option pursuant to the sixteenth amendment to the Constitution. He urges that section 61 of the Internal Revenue Code of 1954 taxes all income when received and that taxing at a later date pursuant to Treasury Regulations, § 1.421–6(d) (1), would exceed the authority conferred by the statute and violate the sixteenth amendment. We reject that contention.[16]

For the foregoing reasons, the decision of the Tax Court is affirmed.

PELL, Circuit Judge (dissenting).

In this case, the Tax Court and the majority opinion impose a tax liability in excess of half a million dollars on "paper" income assertedly derived by the taxpayer in the year 1960 by his exercise of stock options. I must respectfully dissent on the basis that the Tax Court's decision is clearly erroneous on one of two alternative grounds.

Section 1.421–6(c) (3) (i) of the Regulations provides that where an option is not actively traded on an established market, the fair market value of such option is not readily ascertainable unless the value can be measured with reasonable accuracy, which requires that the taxpayer be able to show the existence of certain conditions.

At the time of the hearing before the Tax Court, the parties were in agreement that the first three conditions were satisfied under the facts of the case, to-wit: (a) the option is freely transferable by the optionee; (b) the option is exercisable immediately in full by the optionee; and (c) the option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect on the fair market value of the option as such property.

The fourth condition, and the one on which the Tax Court and majority opinion found against the taxpayer here, is that the fair market value of the option privilege must be readily ascertainable in accordance with further subparagraphs of the regulation.

While it might be fairly argued that in the "spelling-out" which follows in the regulations, the regulations exceed the Congressional intention of the code, the taxpayer contends it is not necessary to reach this result for the stock options had readily ascertainable market value at the time of issuance. He asserts that the basic test of the regulations is that the fair market value of the option is readily ascertainable if the value of the option privilege can be measured with reasonable accuracy. With this contention I would agree.

The underlying controversy here is whether the stock options were taxable, as the taxpayer contends, as of the date of receipt, September 1958, or, as the Government contends, as of the date of the exercise of the option, September 1960. One needs not to be a student of tax cases to infer that a very substantial appreciation in value of the rights and property involved occurred between the two dates and that the date urged by the Government involves the higher amount.

The regulations upon which the Government relies stem from Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956). In LoBue (at page 249, 76 S.Ct. at page 804) the Court stated:

"It is of course possible for the recipient of a stock option to realize an immediate taxable gain. See Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 181–182, 65 S.Ct. 591,

16. See Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956).

593, 89 L.Ed. 830. The option might have a readily ascertainable market value and the recipient might be free to sell his option."

In implementing and defining "readily ascertainable market value" in the regulations, the taxing authority, if the regulations are literally and rigidly applied, might well seem to be precluding the ascertainment of market value in all cases where there was not active trading on an exchange. I do not, however, deem such was the intention and indeed the "spelling-out" in the regulations would have been meaningless if ascertainment of market value was confined solely to exchange-traded items.

The Congressional intent is broadly stated in the Internal Revenue Code of 1954 in defining gross income as all income from whatever source derived including compensation for services. 26 U.S.C. § 61. It remained for *LoBue* to lay down general guidelines for the determination of when the gross income was received in the stock option situation. The possibility of taxation at the receipt rather than the exercise stage, assuming readily ascertainable value, was foreshadowed in Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 182, 65 S.Ct. 591, 593, 89 L.Ed. 830 (1945), where the Court stated, "It of course does not follow that in other circumstances not here present the option itself, rather than the proceeds of its exercise, could not be found to be the only intended compensation."

The result which, in my opinion, should have been arrived at in the case before us, was reached in Colton v. Williams, 209 F.Supp. 381 (N.D.Ohio 1962). There, as here, the Government contended that the option had no value includable in income in the year of the granting because it did not have a readily ascertainable fair market value. The district judge specifically pointed out that there was no requirement that the stock be actively traded on an established market, indicating that the benefits of this section were not to be limited merely to larger corporations. The

court in reaching this decision that within the framework of the regulations there was readily ascertainable market value laid particular stress on the expert testimony of an informed broker.

In the case before us, the taxpayer introduced the testimony of a partner in an investment banking firm. In his testimony this expert, considering various factors involved in this type of situation, placed a specific value on the option as of the issuance date, September 1958. The Government expert witnesses in effect agreed that under normal procedure of brokerage and investment banking houses, values were placed upon items such as this although the Government witnesses did not testify to specific values. Although there was essentially agreement as to the procedures for valuation, the Tax Court rejected the specific valuation testimony basically because the wide disparity of opinion indicated no readily ascertainable market value.

The business world utilizes the stock option for employees. The investment world appears to be able to cope in most cases with the matter of placing valuation on these options as of the date of issuance. Of course, there must be some value at the date of issuance but that was not controverted here. In the case of unlisted securities in which there is not heavy trading, experts may frequently disagree but that does not prevent a trier of fact from determining with ready facility a market value. I am not dealing here with policy aspects of stock options. If Congress had chosen to prohibit their utilization or to lay down specific rules as to their taxability it could do so. It has not chosen, however, to do either.

Businessmen who have stock options should have some guidelines to determine the time of taxability of these options rather than discovering many years later, as in the case before us, that a staggering amount of tax with interest thereon was owing on a transaction which realized only "paper" income. As stated by Mr. Justice Harlan in dissent-

ing in Commissioner of Internal Revenue v. LoBue, *supra*, 351 U.S. at p. 251, 76 S.Ct. 800, any other result makes the division of the total gains between ordinary income and capital gain dependent solely upon the fortuitous circumstance of when the employee exercises his option. I recognize, of course, that the taxpayer will always have the burden of demonstrating, in addition to the other conditions such as immediate exercisability and free transferability, that at the date of issuance there was a readily ascertainable market value. Here it appears to me that the taxpayer has discharged his burden.

The result reached by the Tax Court puts the matter on a pick and choose basis with the Internal Revenue Service where small companies are involved. I dare say that if the value of the stock of the company here involved had depreciated between 1958 and 1960 because of bankruptcy or other economic factors, the Government would have contended that there was readily ascertainable market value as of the date of the granting of the option.

Thus, in an earlier case from this court, Fesler v. Commissioner of Internal Revenue, 38 F.2d 155 (1930), the position was reversed and the taxpayer was contending in a different factual situation that as of the date of a transfer of certain securities they did not have a readily realizable market value.

This court rejected the taxpayer's contention that the lack of an active market should be equated with readily realizable market value stating, at p. 158: "The word 'readily' does not mean immediately, but easily or promptly. It is a relative and not an absolute term, and must be interpreted by the circumstances which are related to the transactions in question."

Even though the securities in *Fesler* involved large blocks and assertedly would have had to have been sold over a period of time, this court affirmed the Board of Tax Appeals in finding that there was a readily realizable market

value on the date of the transfer. Also, in McNamara v. Commissioner of Internal Revenue, 210 F.2d 505 (1954), this court in a case decided before the promulgation of the Treasury Regulation with which we are here dealing reversed the Tax Court holding that a stock option was intended as additional compensation for services for the year in which the option was granted and that it was not taxable in the year of exercise. In *LoBue, supra*, 351 U.S. at p. 246, 76 S.Ct. 800, the court in referring to cases where there might be a readily ascertainable market value and an immediate taxable gain cited in a footnote the *McNamara* case.

In summary, it appears to me that the Tax Court in disregarding the practice of the market and specific testimony on value reached a clearly erroneous result and that even under the regulations the taxable date was that of the issuance of the options.

In the majority opinion, there is outlined the alternative contention of the taxpayer which, of course, is inconsistent with his first contention, that if the option had no readily ascertainable market value at grant there were sufficient restrictions upon his sale of the stock resulting from the exercise of the option as to prevent taxability at the date of the exercise of the option.

The various claimed restrictions are outlined in the majority opinion and need not be repeated here.

The pertinent subsection of the Treasury Regulation provides in part as follows:

"If the option is exercised by the person to whom it was granted but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property *is subject to a restriction which has a significant effect on its value*, the employee realizes compensation at the time such restriction lapses or at the time the property is sold or exchanged, in an arm's length transac-

tion, whichever occurs earlier. * * *" Treasury Regulations, § 1.-421–6(d) (2) (i) (Emphasis supplied.)

The Tax Court attempted to distinguish the case of *Ira Hirsch,* 51 T.C. 121 (1968), urged by the taxpayer as supporting his position. I take this as some indication the Tax Court felt that if *Hirsch* had been factually applicable that the law stated in *Hirsch* was still viable, to-wit, that restrictions on the transfer of stock deriving from the operation of the Securities Act of 1933 constitute restrictions having a significant effect on the value of stock within the intendment of the regulations.

The majority opinion agrees with the taxpayer that *Ira Hirsch* is indistinguishable but holds against the taxpayer on the ground that *Hirsch* was incorrectly decided.

Assuming that *Hirsch* is factually indistinguishable I find no support for the majority's opinion that it is not good law.

The essence of the majority's holding is that the restrictions contemplated in the regulations are of a contractual nature preventing the sale of the stock at its fair market value. Primarily, this conclusion is arrived at on the basis of the various examples utilized in the regulation, all of which pertain to contractual restrictions. However, it appears to me that a restriction which has a significant effect on its value is not limited as to source and if the Securities Act of 1933 in its operation restricts the ready sale of a security then it is squarely a restriction within the meaning of the regulation.[1] Examples are merely illustrative and are not controlling where the language is clear and explicit as it is here.

I would, therefore, for either of the reasons discussed herein reverse the Tax Court.

---

1. To paraphrase an oft-quoted aphorism, a restriction is a restriction is a restriction.