JACK F. MORRISON AND MARGARET V. MORRISON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6895–70.    Filed November 15, 1972.

*Benjamin G. Cox* and *Victor E. Aldridge, Jr.*, for the petitioners. *Robert P. Ruwe*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioners' income tax for 1966 in the amount of $36,555.77. The issues presented for decision are as follows:

(1) Whether a right to acquire 75 shares of stock in a corporation surviving a merger, in addition to a pro rata distribution of other

shares, was received by petitioner Jack F. Morrison as consideration for future services and a covenant not to compete; and, if so,

(2) What was the fair market value of the option received by petitioner Jack F. Morrison?

### FINDINGS OF FACT

At the time they filed their petition, Jack F. Morrison (hereinafter referred to as petitioner) and Margaret V. Morrison, husband and wife, were legal residents of Terre Haute, Ind. They filed their joint Federal income tax return for 1966 with the district director of internal revenue, Indianapolis, Ind.

Prior to 1966, petitioner was secretary-treasurer and a director and James C. O'Neal (hereinafter O'Neal) was president and a director of Sig: Laboratories, Inc. (hereinafter Sig), a corporation which they had organized with its principal place of business at Marshall, Ill. Sig, which had only one class of stock, was engaged in the business of purchasing, packaging, and selling prescription medicines to doctors and hospitals. Petitioner and O'Neal owned a majority of Sig's stock.

Intra Products, Inc. (hereinafter Intra), was an Ohio corporation with its principal place of business at Dayton, Ohio. It had only one class of stock and was engaged in the manufacture of hypodermic solutions and other pharmaceutical products for hospitals, doctors, and distributors. Kenneth P. Lusher (hereinafter Lusher) was the president and majority shareholder (75 percent to 80 percent) of Intra.

During the fall of 1965, petitioner and O'Neal were having difficulties getting along with each other, and they decided to dispose of their stock in Sig. In October of 1965, they ran a blind advertisement in the Drug Trade News, indicating their stock was for sale, and Lusher answered the advertisement. From October to December 1965, petitioner and O'Neal negotiated with Lusher on a sale proposal calling for a cash payment. Lusher considered the cash price set by petitioner and O'Neal too high, and they were unable to work out a stock exchange. The negotiations broke down.

In late December of 1965, petitioner and O'Neal resumed their negotiations with Lusher. Petitioner and O'Neal proposed that Sig be merged with Intra, and that the shareholders of Sig receive 666 shares (⅓ of the capital stock) of Intra, the surviving corporation. They also agreed to enter into employment contracts with Intra, including terms prohibiting them from competing with Intra. One objective was to arrange for Intra to sell its stock on the public market as soon as possible.

Lusher accepted the proposal and had a draft of a proposed merger agreement prepared by Intra's counsel and sent to petitioner and O'Neal. The proposed agreement called for the merger to be completed

not later than June 1, 1966. It provided that Intra's shareholders would retain 1,334 shares and Sig's shareholders would receive 666 shares of Intra, the corporation surviving the merger, on a pro rata basis. Petitioner was to be hired as divisional sales manager in Illinois, and O'Neal as vice president and sales manager. All outstanding stock options were to be exercised or canceled prior to the completion of the merger. The proposed agreement recited that one of the principal motives of petitioner and O'Neal in entering the agreement was their desire that Intra sell its stock on the public market as soon as economically feasible.

Lusher considered it of importance that petitioner and O'Neal agree to be employed by the surviving corporation. O'Neal previously had left the employment of Marion Laboratories and allegedly had violated his agreement with that organization by competing for its business. Lusher had been informed that legal action had been brought against O'Neal for these contract violations, and he believed that petitioner and O'Neal could have damaged the business had they been allowed to compete with the surviving corporation following the merger. Lusher did not request any other officers or employees of Sig to enter an employment contract with the surviving corporation or to agree not to compete with it.

Although the exchange of 666 shares of Intra stock for all the Sig stock was satisfactory with petitioner and O'Neal, they decided that they wanted a higher proportion of such shares than a distribution on a pro rata basis would allow them. They proposed to Lusher that 516 shares be distributed pro rata to the shareholders of Sig and that petitioner and O'Neal each be given an option for an additional 75 shares at $1 per share. Lusher agreed to this counterproposal on the conditions, however, that petitioner and O'Neal disclose to all of the Sig shareholders their acquisition of the additional shares as part of the deal, that petitioner and O'Neal acquire the shares of all objecting shareholders, and that they save Intra harmless from any liability to any dissenting shareholder. The parties agreed to these conditions, and the merger agreement and related employment contracts were prepared.

An agreement, signed on March 22, 1966, by "Kenneth P. Lusher, principal officer and shareholder of Intra," and Intra, first parties, and "Jack F. Morrison [petitioner] and James C. O'Neal, principal officers and shareholders of Sig," and Sig, second parties, reflected the terms on which the parties had agreed. This signed agreement was basically similar to the draft agreement described above, with the exception of the provisions designed to give petitioner and O'Neal the option for the additional shares rather than to provide for a pro rata

distribution of all the shares. For the purposes of this case, the following paragraphs are pertinent:

(1) INTRA and SIG shall merge into one Ohio corporation to be known as Intra Products, Inc., subject to the approval of the number of the shareholders of each corporation required to approve said merger by the laws of the State of Ohio and Illinois.

(2) The merger shall be completed by June 1, 1966, or as soon as the legal and accounting problems and work required, can be completed, whichever occurs first.

(3) Intra Products, Inc. has Two Thousand (2,000) shares authorized, and at the time of the merger shall have Thirteen Hundred and Thirty-four (1,334) shares outstanding to the present INTRA shareholders, and at the time of the merger, Five Hundred Sixteen (516) shares shall be issued on a pro-rata basis to the present shareholders of SIG in exchange for all of the outstanding shares of stock of SIG.

(4) Jack F. Morrison and James C. O'Neal, as part of their employment contracts, will each be granted an option by INTRA so that each of them has the right to purchase Seventy-five (75) shares of common stock of INTRA at One Dollar ($1.00) per share. Each may purchase all or any part of his Seventy-five (75) shares within three (3) years from the date of this Agreement.

(5) The number of directors of INTRA shall be increased from five (5) to seven (7) upon completion of the merger, and Morrison and O'Neal shall serve on the Board of Directors of the surviving corporation with the present board members of INTRA.

\* \* \* \* \* \* \*

(7) O'Neal, after the merger is complete, shall be hired by Intra Products, Inc. as a Vice-President and Sales Manager, and shall be given an employment contract, a copy of which is attached hereto and incorporated by reference, as though rewritten herein, and marked Exhibit "B".

(8) All outstanding stock options now in existence by either SIG or INTRA, shall be exercised or cancelled prior to completion of the merger and shall be known to parties, and no more stock options shall be granted by either INTRA or SIG after the execution of this Agreement.

\* \* \* \* \* \* \*

(10) Jack F. Morrison and James C. O'Neal shall equally buy all the shares of stock from any and all shareholders of SIG who dissent to this merger and/or demand cash payment for their shares of stock in SIG, and shall save harmless the surviving corporation from any liability thereon and shall defend at their expense any suits filed by any dissenting SIG shareholders.

The agreement further recites that one of the principal motives and considerations inducing petitioner and O'Neal to enter the deal was the desire to have Intra "go public whenever it is economically feasible for INTRA and its shareholders." It was agreed that Intra would take the necessary steps to this end prior to January 31, 1969.

The agreement of merger was approved by Sig's directors on March 19, 1966. Petitioner and O'Neal sent letters to all of the Sig shareholders on or about March 24, 1966, advising them of the terms of the proposed merger and the approval thereof by Sig's directors and offering to purchase the Sig shares at the price of $12 per share.

The letter states that the current book value of the stock was $7.70 per share.

Under date of March 25, 1966, Intra's attorney wrote petitioner's attorney a letter which, in part, stated:

I assume that a copy of the merger agreement executed between the parties will be sent to all of the shareholders of Sig, since * * * it was agreed that there would be a disclosure to the shareholders of the additional shares which Mr. Morrison and Mr. O'Neal were obtaining in Intra Products, as part of the deal.

On March 25, 1966, a notice was mailed to the shareholders of Sig informing them of a meeting on April 16, 1966, to vote upon a plan of merger of Sig and Intra. The plan of merger as described in the notice stated, among other things, that "The manner and basis of converting the shares held in SIG: LABORATORIES, INC. into the surviving corporation will be on the basis of twenty-five (25) shares of SIG: LABORATORIES, INC. stock for one share of the surviving corporation."

Pursuant to the offer of March 24, 1966, and prior to April 19, 1966, petitioner in eight separate transactions purchased 678 shares of Sig stock and O'Neal purchased 800 to 1,000 shares at a price of $12 per share. Wayne Jones, during May of 1966, purchased 50 shares of Sig stock at $12 per share.

At a meeting of the shareholders on April 16, 1966, the proposed merger with Intra was approved by a vote of 10,295 shares in favor and 155 shares in opposition. The resolution approving the merger described the "manner and basis" for converting Sig shares into Intra shares in the same language as that quoted above from the notice of the meeting. Paul Hipple attended the meeting on behalf of Lewis E. Adkins, who owned the 155 Sig shares voted in opposition to the merger, and was told that the stock options given to petitioner and O'Neal were part of their employment contracts.

The "Employment Contract" referred to in the merger agreement as exhibit A, was executed by Intra, referred to therein as "Company," and petitioner, referred to as "Employee," under date of "this ——— day of May, 1966." [1] The pertinent paragraphs are as follows:

(1) The Company agrees to, and does hereby employ the Employee as a member of the Board of Directors and Vice-President in charge of Durr Sales and such other duties as may be assigned him by the Board of Directors, and this Agreement shall continue in effect for a period of five (5) years from the date of the execution of the Agreement or until one (1) year after the Company goes public and first sells its securities to the public, whichever date occurs first.

(2) The Employee shall receive from the Company for his compensation for services rendered under the terms of this contract, the sum of Twelve Thousand Nine Hundred Dollars ($12,900.00) per year, said sum to be paid in equal amounts every two weeks during the term of this contract, and each year either at the end of the year or at the end of each quarter, at the discretion of the Board of Directors, the Employee shall receive as a bonus in addition to said salary, a

---

[1] The record does not show the precise date on which the contract was signed.

sum equal to One-half per cent (½%) of the gross sales of the Company for said period.

(3) The Employee is hereby granted an option from the Company so that he may purchase Seventy-five (75) shares of common stock of the Company at One Dollar ($1.00) per share. This option may be exercised in whole or in part on or before the 30 day of March, 1969.

(4) The Employee shall receive in addition to the foregoing for his services, hospitalization to be paid by the Company, and an annual two weeks vacation with pay, and shall receive travel expense on the same basis as currently being paid to the President of the Company.

*　　*　　*　　*　　*　　*　　*

(7) The Employee, so long as this Agreement is in effect, and for one (1) year after termination of this Agreement, shall not directly or indirectly, either as principal, agent, stockholder or any other capacity, engage in or have financial interest in, any business which is competitive to the business of the Company and its subsidiaries, except that nothing contained herein shall preclude the Employee from purchasing or owning stock in any such business, providing that his holdings do not exceed ten per cent (10%) of the issued and outstanding capital stock. * * *

*　　*　　*　　*　　*　　*　　*

(9) The parties hereto agree that this Agreement contains the entire understanding and agreement between the parties and there are no other agreements and representations or conditions, written or verbal, other than contained herein; and that the Agreement between the parties cannot be amended, modified or supplemented in any respect, except by a subsequent written Agreement entered into by both parties thereto.

During the course of the negotiation of the merger and employment agreements, the attorney representing petitioner and O'Neal explained the possible tax implications which could be drawn from the inclusion of the stock option provisions in the employment contracts. In petitioner's presence, O'Neal replied, "Well, I'll cross that bridge when I get to it."

An "Agreement of Merger," dated May 24, 1966, and "Articles of Merger," dated May 26, 1966, were filed with the secretaries of state in compliance with the laws of the respective States of Illinois and Ohio. In these instruments, it is stated that the Sig shareholders in exchange for their stock will receive pro rata 516 shares of Intra; there is no reference in either instrument to the stock options granted to petitioner and O'Neal. These papers state that the merger was to be effective as of May 31, 1966.

Pursuant to the plan of merger, Intra distributed 516 shares of its capital stock to the Sig shareholders on a pro rata basis of 1 share of Intra stock for each 25 shares of Sig stock and redeemed the entire 12,900 shares of Sig stock then issued and outstanding. As to the option obtained by petitioner, stock certificate No. 73, dated June 3, 1966, covering the 75 shares was prepared by Intra, and it recites that it was issued on the same date and was fully paid and nonassessable. This stock certificate, however, was not delivered to petitioner and payment therefor was not made until October 17, 1966.

On August 9, 1966, Lewis E. Adkins, as a dissenting shareholder of Sig, filed a suit against Intra in the Circuit Court of Illinois, Clark County, alleging that the fair market value of his Sig stock was $52.50 per share and asking judgment for $8,137.50 as the value of his 155 shares of Sig. On or about October 18, 1966, petitioner and O'Neal paid Adkins $4,900 for his 155 shares of Sig in settlement of the suit.

On October 17, 1966, petitioner exercised his option to the additional 75 shares of stock, paid Intra $75, and received the stock certificate covering such shares.

Petitioner's employment contract with Sig, entered into in October 1965, provided an annual salary of $18,000 per year, plus commissions. Under this contract, petitioner's earnings from salaries and commissions for the 5 months of January through May 1966 totaled $11,435. Excluding the stock options here in dispute, petitioner's employment contract with Intra provided for a salary of $12,900 per year, plus a bonus of ½ percent of the gross sales of the company. Under this contract, petitioner received salaries and commissions (other than the stock options) totaling $11,539.87 for the 7 months of June through December 1966.

Without the knowledge of petitioner and O'Neal, on or about March 1, 1966, Lusher opened negotiations with Revlon, Inc. (hereinafter Revlon), concerning a possible merger or other disposition of Intra's stock. Not until a meeting on September 24, 1966, did Lusher tell the directors of Intra about his Revlon negotiations. At that time, he advised them that Revlon had offered $1,600,000 for Intra's stock. The directors authorized Lusher to make a counterproposal calling for Intra's shareholders to receive $1,800,000 in Revlon's stock, with such stock priced at $40 per share. Both proposals called for Intra to pay a finder's fee.

On October 24, 1966, Intra and Revlon adopted a plan of reorganization whereby Intra's shareholders received 42,702 shares of Revlon for their stock. The market value of Revlon's shares at that time was $37.46875 per share.

In the notice of deficiency, respondent determined that the stock option granted to petitioner was compensatory, had no readily ascertainable value when granted, and is to be taken into account for Federal income tax purposes when exercised on October 17, 1966. Respondent computed the ordinary income realized from the option to be $74,925.

#### ULTIMATE FINDINGS OF FACT

The rights granted to petitioner under the option to acquire 75 shares of Intra stock, set forth in his employment contract with Intra, were compensatory in nature. The option was designed to compensate petitioner for his agreement to work for Intra for 5 years and for his covenant not to compete with Intra for an additional year.

As of May 31, 1966, the value of the stock option rights obtained by petitioner was $299 per share of Intra stock.

## OPINION

The issue here presented requires a resolution of the tax consequences to petitioner of one aspect of a corporate reorganization, a statutory merger which both parties agree falls within section 368(a)(1)(A).[2] Respondent contends that the stock option rights obtained by petitioner in connection with the merger were compensatory and that petitioner is taxable under section 356(f)(2) on the fair market value of the 75 shares obtained pursuant to the option as of the date on which it was exercised. Alternatively, respondent contends that, if the shares covered by the options were not compensatory, their value is taxable to petitioner as boot under section 356(a)(1). Petitioner contends that he and O'Neal each received an option as a device for giving them a premium for their majority interest in the merged corporation and that, by reason of section 354(a)(1), no part of the value of those shares represents taxable income.

The issues framed by these contentions have been skillfully tried and briefed by both parties, and the questions presented are close ones. However, we think a preponderance of the evidence supports our ultimate finding that the option for the 75 shares of Intra stock was received by petitioner as consideration for his promised services and the covenant not to compete. We need not consider respondent's alternative contention.

Where stock or securities in a corporation which is a party to a reorganization are exchanged, in pursuance of the plan of reorganization, for the stock or securities in another corporate party to the reorganization, section 354[3] provides that no gain or loss shall be recognized. However, if the transaction "has the effect of the payment of compensation," it is outside the coverage of section 354, and section

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue, unless otherwise noted.

[3] SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

  (a) GENERAL RULE.—

    (1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

    \*      \*      \*      \*      \*      \*      \*

    (3) CROSS REFERENCE.—

    For treatment of the exchange if any property is received which is not permitted to be received under this subsection (including an excess principal amount of securities received over securities surrendered), see section 356.

356(f)(2) [4] contemplates that its tax treatment will be governed by section 61(a)(1), i.e., the compensation will constitute gross income. Thus, if the rights to all, or any part, of the 75 shares covered by the option which petitioner acquired in the reorganization were compensatory in nature, he realized ordinary income in respect thereto even though he received the option as a feature of the reorganization and the purchase of the stock at a bargain price involved an outlay of funds on his part. See generally *Commissioner* v. *LoBue*, 351 U.S. 243 (1956); *Commissioner* v. *Smith*, 324 U.S. 177 (1945). We must, therefore, examine the circumstances in which petitioner obtained the option and the stock covered by it.

Parenthetically, we note that we do not subscribe to respondent's theory that in making this examination we are precluded from looking beyond the written documents by the rule of *Commissioner* v. *Danielson*, 378 F. 2d 771, 775 (C.A. 3, 1967), vacating and remanding with directions 44 T.C. 549 (1965), or the less stringent rule explained in *John T. Dodson*, 52 T.C. 544, 559 (1969). None of the documents expressly declares what consideration was given for the stock options. The language of the documents is ambiguous on this subject, and further ambiguities are created by the order in which the various instruments were signed. While the several instruments are significant to the resolution of the present controversy, we think the issue is basically a factual one which must be decided in the light of the entire record.

The testimony is undisputed that Lusher, who negotiated the merger on behalf of Intra, insisted that petitioner and O'Neal continue in the employment of the surviving corporation and that they give a covenant not to compete for a stated period. From Lusher's standpoint, this was a "prerequisite" to any plan for the merger of the two corporations. He regarded petitioner and O'Neal as talented salesmen, and he explained that it is common in the pharmaceutical field for a salesman to leave a business and "take" other sales representatives with him. In this way, he thought petitioner and O'Neal could have seriously damaged the Sig operation. He was particularly concerned about O'Neal who was at that time engaged in legal negotiations or litigation in which it was charged that he had violated an employment contract with a previous employer.

The first draft of the merger agreement called for the shareholders of Sig to receive 666 shares (1/3) of the stock of the surviving corpo-

---

[4] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.

    (f) TRANSACTIONS INVOLVING GIFT OR COMPENSATION.—

        For special rules for a transaction described in section 354, 355, or this section, but which—

        *       *       *       *       *       *       *

        (2) has the effect of the payment of compensation, see section 61(a)(1).

ration on a pro rata basis and for petitioner and O'Neal to enter into employment contracts. This arrangement would have resulted in an exchange of 19.37 shares in Sig for each share of Intra stock. Petitioner and O'Neal were to be treated the same as all the other Sig shareholders even though they were the only ones required to commit themselves to work for Intra or give a noncompete covenant. At this point, petitioner and O'Neal suggested that the deal be changed to call for each of them to receive a stock option for 75 shares and for Sig's shareholders to receive only 516 shares pro rata, i.e., 25 shares of Sig for 1 share of Intra. The critical consideration is why this change was made.

Petitioner steadfastly maintains that he received the 75 shares covered by the option in partial exchange for his Sig stock. However, none of the written instruments provides substantial support for this position, and petitioner did not testify that the transaction was negotiated on this basis. To the contrary, we think the most reasonable inference to be drawn from the record as a whole is that petitioner and O'Neal insisted on receiving the extra shares as consideration for their future services and the noncompete covenants.

Although various difficulties between petitioner and O'Neal precipitated their initial efforts to dispose of their Sig stock so they could sever their business relationship, Lusher was adamant that they give Intra an employment contract. The salary and commission arrangement incorporated in petitioner's employment contract with Intra was not particularly favorable since, notwithstanding the inconvenience and expense occasioned by the arrangement, petitioner's salary and commission income from Intra following the merger netted him less money per month than he had received from Sig prior thereto. These considerations apparently prompted petitioner and O'Neal to go back to Lusher and propose the stock option arrangement. They were evidently unwilling to tie themselves down to the job with Intra for possibly 5 years and to commit themselves to a noncompete covenant for an additional year without some special consideration.

Lusher acceded to the proposed revision of the deal only on the conditions that petitioner and O'Neal would inform the other Sig shareholders and obtain their approval. Lusher's interests were not adversely affected by giving petitioner and O'Neal the options if the minority shareholders gave their consent. At the suggestion of petitioner and O'Neal, the merger agreement was revised to provide that the stock options would be included in the employment contracts and they were so included. The notice of the merger proposal sent to the Sig shareholders recited that the "manner and basis" of converting Sig shares would be in the ratio of 25 shares for 1 share of Intra. The

resolution adopted by the Sig shareholders called for a merger on the same terms. These instruments at least imply that the stock options were not part of the consideration for the stock exchange but were consideration for the employment contracts. This conversion ratio of 25 for 1 left the additional 150 Intra shares covered by the stock options. A representative of the one dissenting shareholder testified that the officials of Sig, who presented the merger proposal at the meeting at which it was approved, affirmed that the stock options were part of the employment contract. To conclude that the options were not compensatory would require us to assume that petitioner and O'Neal deliberately misled the other shareholders. We decline to do this.

The formal merger agreements filed with the Illinois and Ohio State authorities in accordance with the applicable statutes stated that the Sig stock would be exchanged pro rata on the basis of 25 shares for 1 Intra share. Nothing was said in those agreements about the option. To be sure, these forms of the merger agreements were tailored to the requirements of the applicable State statutes, but we note that the controlling statutes of each State specify that the manner and basis upon which the stock is to be exchanged shall be stated in the merger plan. Ill. Ann. Stat., ch. 32, secs. 157.62, 157.65, 157.66, and 157.69(a) (Smith-Hurd 1954); Ohio Rev. Code Ann., secs. 1701.78 and 1701.82 (Page 1964). Cf. sec. 1.368-2(g), Income Tax Regs.

All of this evidence points to the conclusion that the stock option was compensatory in nature. We think it was designed to provide additional consideration for petitioner's promised services and the covenant not to compete.[5] We need not determine whether the source of this additional consideration was Intra or, in part, the other shareholders of Sig who wanted to see the merger effectuated; under either view the option was compensatory. *Philip W. McAbee*, 5 T.C. 1130, 1147 (1945); cf. sec. 1.351-1(b)(1), Income Tax Regs. We think the value of the option is taxable to petitioner under section 61(a)(1). *William H. Husted*, 47 T.C. 664, 677 (1967), acq. 1968-1 C.B. 2; *Philip W. McAbee, supra* at 1144-1148; *Fifth Avenue Bank of New York, Executor*, 31 B.T.A. 945, 953 (1934), affd. 84 F. 2d 787 (C.A. 3, 1936); cf. *United States* v. *Frazell*, 335 F. 2d 487, 489, on rehearing

---

[5] Petitioner argues that the option arrangement gave him only 29 more shares than he would have received in a straight pro rata exchange and that his compensation did not exceed the value of that number of shares. The answer is that the straight pro-rata-exchange proposal also called for petitioner and O'Neal to promise their services and give a noncompete covenant. Petitioner and O'Neal, in effect, valuated those service-related features of the exchange through the stock option arrangement which they proposed and Lusher accepted.

339 F. 2d 885, 886 (C.A. 5, 1964), certiorari denied 380 U.S. 961 (1965).

Having concluded that the stock option was compensatory, we must now decide how much taxable income was realized by petitioner in 1966. This depends upon whether petitioner is taxable at the time the option was granted or when it was exercised.[6] While the option was formally granted in the employment contract executed sometime in May 1966, it could not have had substantive effect until May 31, 1966, when the merger was completed. We think this latter date is the crucial one, and that petitioner is taxable on the option's value as of that date.

Both parties agree that the option does not qualify for the treatment accorded "statutory stock options" under sections 421 through 425. The option must, therefore, be regarded as a nonstatutory stock option for tax purposes, and the Treasury has promulgated regulations (sec. 1.421-6, Income Tax Regs.) setting forth detailed rules for the nonstatutory stock option area.

These regulations lay down rather detailed standards for determining whether a stock option has a readily ascertainable fair market value and thus represents taxable income when received. The Supreme Court has twice recognized the possibility that the receipt of a stock option may be a taxable event. *Commissioner* v. *LoBue, supra;*[7] *Commissioner* v. *Smith, supra.*[8] Decisions of this Court and other courts in the light of the peculiar facts have held the receipt of an option to be a taxable event. *Estate of Lauson Stone*, 19 T.C. 872 (1953), affd. 210 F. 2d 33 (C.A. 3, 1954) ; *Colton* v. *Williams*, 209 F. Supp. 381 (N.D. Ohio 1962). See also *W. G. Maguire & Co.*, 20 T.C. 20, 41-43 (1953) ; see secs. 1.61-2(d) and 1.61-15, Income Tax Regs.

Section 1.421-6(c)(3)(i) of the regulations provides that where, as here, the option is not actively traded on an established market, the fair market value of such option is not readily ascertainable unless that value can be measured with reasonable accuracy. The regulation re-

---

[6] Petitioner argues that the stock option was exercised in May 1966 before the employment contract was signed. However, an allegation in the petition which is admitted in the answer, the opening statement by petitioner's counsel, and a stipulation are to the effect that the option was exercised on Oct. 17, 1966, when petitioner received the stock.

[7] In *Commissioner* v. *LoBue*, 351 U.S. 243, 249 (1956), the Court said : "It is of course possible for the recipient of a stock option to realize an immediate taxable gain. * * * The option might have a readily ascertainable market value and the recipient might be free to sell his option. * * *"

[8] In *Commissioner* v. *Smith*, 324 U.S. 177, 181 (1945), the Court said : "When the option price is less than the market price of the property for the purchase of which the option is given, it may have present value and may be found to be itself compensation for services rendered."

quires the taxpayer to be able to show that all of the following conditions exist:

(a) The option is freely transferable by the optionee;

(b) The option is exercisable immediately in full by the optionee;

(c) The option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect upon the fair market value of the option or such property; and

(d) The fair market value of the option privilege is readily ascertainable in accordance with subdivision (ii) of this subparagraph.

Subdivision (ii) of that paragraph states, among other things:

for purposes of this section, the fair market value of the option is not readily ascertainable unless the value of the option privilege can be measured with reasonable accuracy. In determining whether the value of the option privilege is readily ascertainable, and in determining the amount of such value when such value is readily ascertainable, it is necessary to consider—

(a) Whether the value of the property subject to the option can be ascertained;

(b) The probability of any ascertainable value of such property increasing or decreasing; and

(c) The length of the period during which the option can be exercised.

See *M. P. Frank*, 54 T.C. 75 (1970), affd. 447 F.2d 552 (C.A. 7, 1971).

The requirements of paragraphs (a), (b), and (c), listed in the above regulation, are met, and there is no argument to the contrary. As to subdivision (ii) of paragraph (d), we think it also is met. The option in the instant case, in terms of value, was the substantial equivalent of the stock itself. By paying the nominal sum of $1 per share, petitioner could have received at any time the valuable stock represented by a certificate which had already been prepared, dated, and stamped "Issued June 3, 1966." To hold the value of the option was not ascertainable would require a hypertechnical reading of the regulation.

As to the fair market value of the option, we are not aided by any expert testimony. But we do have the practical fact that the merger plan called for 1 share of Intra stock to be received for each 25 shares of Sig stock. We also know that petitioner purchased 678 shares of Sig stock from eight different vendors during the period immediately preceding the merger. During this same period, O'Neal bought 800 to 1,000 additional Sig shares at $12 per share. The offer which petitioner and O'Neal made to the minority shareholders recites that the book value was only $7.70 per share. In another transaction, Wayne Jones bought 50 shares at the same price during the same period. When these transactions occurred, the selling Sig shareholders had been informed of the terms of Sig's merger with Intra. These transactions were sufficient to establish the value of the Sig stock during the period the merger was worked out, and from its value we may calculate the value of the Intra stock as of May 31, 1966.

In the light of these transactions, we hold that the value of the stock option received by petitioner was $299 ($300–$1 option price) per share. We think this valuation is far more reasonable than the $999 ($1,000–$1 option price) used by respondent in making his determination. The only support cited for this value was the negotiating figure used by Lusher in dealing with Revlon. That value assumed the ultimate success of the negotiations for the subsequent merger of Intra into Revlon. As of May 31, 1966, according to Lusher's testimony, he was the only one connected with either Intra or Sig who knew those negotiations were in progress. We do not think they had reached the point where they added materially to the value of the Intra stock as of the crucial date.

To reflect the foregoing conclusions,

*Decision will be entered under Rule 50.*