HARRY H. MITCHELL AND JUNE H. MITCHELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mitchell v. Commissioner
Docket No. 31051-87
United States Tax Court
T.C. Memo 1990-617; 1990 Tax Ct. Memo LEXIS 692; 60 T.C.M. (CCH) 1368; T.C.M. (RIA) 90617; December 6, 1990, Filed *692 Decision will be entered under Rule 155. Bruce I. Hochman, Jerome A. Busch and Harry H. Mitchell, for the petitioners. Charles O. Cobb and Richard Stack, for the respondent. WRIGHT, Judge. WRIGHT
*1985 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in petitioners' Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6653(a) [1]
1973
$ 33,577
$ 1,679
1974
26,337
1,317
1975
10,146
-- 1976
109,383
-- 1977
4,193
-- 1978
25,831
-- 1980
16,244
-- *695 After concessions by both parties, the remaining issues for decision are: (1) whether petitioners are entitled to a business expense deduction in taxable year 1973 for a portion of the purchase price of a stock warrant; (2) whether petitioners must recognize income as determined by respondent in taxable year 1976 due to the exchange of such warrant for stock; (3) whether amounts received by petitioner Harry H. Mitchell in taxable year 1980 in connection with the settlement of litigation are excludable from gross income under section 104(a)(2); (4) whether the Leslie Investment Company, which is owned by petitioners and their children, is entitled to carry back a net operating loss incurred in taxable year 1981, a year in which the company was a subchapter C corporation, to taxable year 1980, a year in which the corporation was a subchapter S corporation. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the accompanying exhibits are incorporated herein. I. Warrant Issues
Petitioners resided in Palm Desert, California, when they filed their petition. In 1970, petitioner became the chief executive officer, *696 and, in 1971, chairman of the board of directors, of the California Life Corporation (hereinafter referred to as CLC) and the California Life Insurance Company (hereinafter referred to as CLIC). CLIC was CLC's principal operating subsidiary. The outstanding stock of CLC was listed on the American Stock Exchange. There were approximately 1,000,000 shares of its common stock outstanding from January of 1973 through May of 1976. In June of 1972, CLC acquired individual and group life insurance (hereinafter referred to as the ITT Hamilton insurance) in the face amount of $ 9,380,000 from ITT Hamilton Life Insurance Company of St. Louis (hereinafter referred to as "ITT Hamilton") for $ 9,336,001. A cash payment of $ 600,210 was made to ITT Hamilton by CLC in June. The remainder of the purchase price was discharged through long-term borrowings of $ 5,000,000 and execution of a short-term note payable to ITT Hamilton for $ 3,735,791. The short-term note was due on December 31, 1972, but was extended at the request of CLC to March 31, 1973. ITT Hamilton informed CLC that no further extensions should be expected. CLC would risk losing the ITT Hamilton insurance if external financing *697 was not arranged with which to repay the ITT Hamilton note by March 31, 1973. As a result, CLC intensified discussions with institutional investors and lenders, seeking an investment or loan large enough to pay off the note due to ITT Hamilton. However, *1986 the investors and banks contacted by CLC felt that some kind of personal investment in CLC by petitioner was necessary before they would consider a loan. The investors and banks considered it critical to assure ongoing, professional management of CLC's insurance operations before committing funds to CLC. An employment contract and related restricted stock options were not regarded as sufficient to bind petitioner to CLC. A. Issuance of the Warrant
On February 16, 1973, CLC offered petitioner a warrant (hereinafter referred to as the warrant) to purchase 90,000 shares of CLC common stock for $ 8 per share, such warrant to be exercisable for 10 years from the date of its issuance. The purchase price for the warrant, $ 103,500, was paid by petitioner from his own funds on March 27, 1973. The warrant required that it and shares received upon its exercise be stamped or otherwise imprinted with a legend substantially in the *698 following form: Neither this warrant nor the shares of Common Stock issuable upon exercise of the warrant have been registered under the Securities Act of 1933, and thus cannot be exercised, sold or transferred, and the shares of Common Stock issuable upon exercise of this warrant cannot be sold or transferred, unless they are so registered or unless an exemption is then available.
The warrant also contained anti-dilution provisions. In the case of issuance by CLC of additional common stock or securities convertible into common shares for a price less than the exercise price of the warrant or the stock exchange price of the stock, adjustments to the warrant would be made reducing the purchase price of the shares subject to the warrant and increasing the number of shares available for purchase. On CLC's 1973 financial statement, the $ 103,500 paid by petitioner for the warrant was credited to paid-in capital. Warrants to purchase CLC stock such as the one issued to petitioner were not actively traded on an established market during the years at issue.
The reasons for the issuance of the warrant to petitioner were described in a 1976 proxy statement of CLC as follows: *699 At the time of the refinancing the Board of Directors determined that in order to assimilate the business obtained from ITT Hamilton and continue the restructuring of the Company began in 1971, it was vital that Mitchell continue to serve as the Chief Executive Officer of the Company, and that this would best be accomplished by his expectation of becoming a substantial equity holder in the relatively near future. In addition, the Company's outside financial advisors, and potential investors approached with respect to the refinancing, were reluctant to finance or invest in the Company unless it was apparent that Mitchell's continued association was, as far as possible, assured by his ownership of a substantial equity-type interest in the Company.
The balance of the purchase price of the ITT Hamilton insurance was refinanced in February of 1973. Part of the funds came from the sale by CLC of one of its subsidiaries. The rest ($6,750,000) was borrowed from the Wells Fargo Bank on February 16, 1973. During 1972, closing prices on the American Stock Exchange for the stock of CLC ranged from a high of $ 3.50, to a low of $ 1.50. In December of 1972 there was a reverse *700 split of 1-for-5. The price of the stock immediately rose to $ 11 per share and a few public sales were recorded at a high of $ 11.50. During February and March of 1973, closing prices for the stock of CLC ranged from $ 8.75 to $ 7.12. On February 16, 1973, the day petitioner was offered the warrant, the closing price of CLC stock was $ 8.50. On March 27, 1973, the day petitioner purchased the warrant, the closing price was $ 7.50. Over the succeeding years the price of CLC stock declined. During this period the high and low closing prices for CLC stock were as follows: Year
High
Low
1973
9-3/8th
2-1/4th
1974
4-1/2th
1-7/8th
1975
3-5/8th
2-3/8th
1976
5
2-5/8th
B. Exchange of the Warrant
As of February 13, 1976 the warrant had not been exercised in whole or in part. On February 13, 1976, petitioner and CLC entered into an agreement to exchange the warrant for 90,000 shares of unregistered CLC common stock. The proposed transaction was set for approval at a meeting of shareholders scheduled for May 21, 1976. The proxy statement issued by the board of directors for this meeting summarized the reasons for the exchange as follows: *701 the Board of Directors believes that the Company has made substantial progress in implementing the program of restructuring and development begun in 1971. It believes that this progress is largely attributable to the efforts of Harry H. Mitchell ("Mitchell"), who became a director and the Chief Executive Officer of the Company in 1970 and Chairman of the Board of Directors in 1971. Furthermore, the Board continues to believe that it is in the best interest of the Company to be assured, insofar as possible, that Mitchell devote his efforts to the Company's program of growth and development. In 1973, the Board of Directors determined that this assurance could best be secured by providing *1987 Mitchell with an immediate and substantial equity interest in the Company. However, the Warrant to purchase up to 90,000 shares of the Company's Common Stock (a copy of which is attached as Exhibit C to this Proxy Statement) issued to Mitchell in 1973 for a cash price of $ 103,500 as the vehicle to effect this equity position has proven, in view of the Board, to be an unsuitable method of providing this interest. This unsuitability arises because, among other things, the unforeseen depression *702 in the market price of the Company's Common Stock has (1) made its exercise in the relatively near future most unlikely, and (2) brought into consideration anti-dilution provisions which pose a substantial problem for the Company in light of its announced policy of aggressive expansion through appropriate acquisitions and external growth. Therefore, on February 13, 1976, the Company agreed with Mitchell, subject to approval by the shareholders as described in this Proxy Statement (1) to cancel the Warrant to purchase 90,000 shares of the Company's Common Stock and all of the rights pertaining thereto (including all anti-dilution and registration rights relating to future issuance of securities, as described below), and (2) in consideration therefor and in order to provide Mitchell with a more appropriate and immediate equity interest in the Company, to issue to him 90,000 shares of the Company's Common Stock (before adjustment for the 4-for-3 stock split described above). The proposed exchange was approved and took place on May 21, 1976. Immediately after the transaction, CLC's common stock was split 4-for-3, so that petitioner held 120,000 shares. During the first *703 three months of 1976, the closing price of CLC stock on the American Stock Exchange ranged from $ 2.75 to $ 5.00. On May 21, 1976, the date the exchange was approved and took place, the average price of the common stock of CLC on the American Stock Exchange was $ 4.375. The value of the 90,000 shares of stock received by petitioner on May 21, 1976, was $ 393,750, not taking into account its lack of registration, and $ 287,437.50, taking into account its lack of registration. Petitioners did not report any gain in connection with the acquisition or disposition of the warrant on their 1973 or 1976 Federal income tax returns. CLC and CLIC earnings declined after 1977 and there were increasing losses through 1982. In 1983, CLC was merged into a company owned by a third party. The common shareholders of CLC, including petitioner, received $ 0.35 per share in the merger. In 1986 the California Insurance Department took possession of CLIC under its statutory powers on the ground that CLIC was insolvent. II. Exclusion From Gross Income Under Section 104(a)(2)
On April 21, 1978, petitioner entered into a new employment agreement with CLC and CLIC. The agreement provided *704 for salary payments in an amount of not less than $ 125,000 per year for a term of 7 years. The agreement also provided for additional compensation of $ 12,500 per year for a period of 20 years, payable to petitioner or his beneficiary. Under the terms of the agreement, petitioner's employment could be terminated on breach by petitioner of his obligations. On May 12, 1979, following a dispute regarding CLC's 1978 financial statement and Form 10K, the board of directors removed petitioner from his position as chief executive officer of CLC. On May 19, 1979, he was removed from his position as chief executive officer of CLIC. Six weeks later, he was removed from his position as chairman of the board of directors. CLC and CLIC ceased paying petitioner his salary under his employment agreement on June 30, 1979. In 1979, a stockholders' suit was filed against CLC, CLIC, and various corporate officers, including petitioner, alleging securities act violations, conspiracy to falsify financial records, and breach of contract. The lawsuits were consolidated into an action before the United States District Court for the Central District of California titled In Re California Life Securities *705 Litigation, Multi District Litigation No. 400. The consolidated action was commonly referred to as the "MDL No. 400 litigation." On November 13, 1979, petitioner filed an action in the Superior Court of the State of California for the County of Los Angeles, titled Mitchell v. California Life Corporation, No. C304161, requesting declaratory relief as to his rights under the 1978 employment agreement. On June 18, 1980, petitioner filed an action in the Superior Court titled Mitchell v. California Life Corporation, No. C 326694, accusing CLC, its board of directors, and certain employees and directors of CLC, of libel, slander, and conspiracy. The action was never served on any of the named defendants. The board of directors of CLC never discussed the action, and CLC's chief executive officer considered it frivolous. On September 12, 1980, petitioner met with Timothy F. Kennedy, who was counsel for CLC. The meeting was for the purpose of entering into negotiations for the settlement of outstanding lawsuits between Mitchell and CLC. At the meeting petitioner delivered to Kennedy a document titled "Principles of Settlement" which stated that petitioner would settle *706 all claims and litigation with CLC and CLIC provided they accepted all of the principles. The Principles of Settlement provides that "of the three payments of $ 50,000 mentioned in paragraph 1, $ 100,000 *1988 will be deemed to be in settlement of employee's lawsuit against CLC, CLIC and various officers and directors for compensatory damages for slander and libel * * *." The Principles of Settlement was not signed by Kennedy or any of CLC's officers, and was not approved by its board of directors. By letter dated September 15, 1980, Kennedy notified petitioner that the Principles of Settlement for settling all claims between petitioner and CLC was acceptable to CLC, but that petitioner must become a settling defendant in the MDL 400 litigation and must also cooperate with CLC in any pending or future litigation. The letter does not specifically address the libel and slander action. On September 15, 1980, petitioner appeared before the United States District Court for the Central District of California and notified the court that he would become a settling defendant in the MDL 400 litigation. On September 22, 1980, petitioner and CLC executed a settlement agreement. The settlement *707 agreement consisted of several documents, including a Memorandum of Understanding, a Revised Restricted Stock Agreement, a Release, and an Amended Employment Agreement. The libel and slander action was not a consideration of CLC in executing the settlement agreement.
The Memorandum of Understanding referred to the other documents and provided, among other things, that all pending litigation between the parties would be dismissed with prejudice. The only exception was the Superior Court action brought by petitioner with respect to his employment agreement. The Memorandum of Understanding provided that with respect to this action dismissal with prejudice would not be entered until the parties fully performed their respective obligations under the Memorandum of Understanding, the Revised Restricted Stock Agreement, and the Amended Employment Agreement.
Paragraph 1 of the Amended Employment Agreement provided that the 1978 Employment Agreement between petitioner and CLC would be cancelled. Paragraph 2 provided, among other things, that petitioner would agree to act as a consultant to the company. Paragraph 3 of the Amended Employment Agreement provided as follows: Unless the *708 Agreement shall be terminated by the Company by reason of a Termination Event, as such term is defined in Section 4 below, Mitchell shall receive total compensation hereunder of $ 192,511, payable as follows: (a) on September 30, 1980, the sum of $ 50,511; (b) on December 1, 1980, the sum of $ 50,000; (c) on June 30, 1981, the sum of $ 50,000; and (d) in addition to the forgoing, on the first day of each month commencing the first day of January 1, 1981, and continuing to and including February 1, 1982, the sum of $ 3,000. The payments referred to in subparagraph (b) and (c) above shall be deemed due on September 30, 1980, but at the election of the Company may be deferred, without payment of interest, to the dates set forth above. Such payments represent a full discharge of such payments owing to Mitchell under the Original Employment Agreement. The agreement was terminable on a variety of grounds, including breach by petitioner of any part of the settlement agreement.
The libel, slander, and conspiracy action was dismissed by petitioner with prejudice on October 1, 1980. The declaratory relief action relating to petitioner's employment agreement was dismissed without *709 prejudice on the same date. The first two payments called for by the Amended Employment Agreement were made to petitioner before the end of 1980. CLC and CLIC issued petitioner a Form W-2 reflecting the full $ 100,511 in payments as "wages, tips, or other compensation." Federal income tax and FICA tax were withheld. Petitioner reported the payment of $ 50,511 as wage income on his 1980 Federal tax return. [2] The remaining payment of $ 50,000 was excluded from income. The third payment of $ 50,000 due to petitioner on or before June 30, 1981, was never made. In April of 1981, CLC informed petitioner that he was in default, and that CLC was terminating the agreement. On August 13, 1981, petitioner filed an action in the Superior Court titled Mitchell v. Monge *710 , No. C 378525, in which he alleged breach of the Amended Employment Agreement. In the pleadings and motions filed by petitioner in the Mitchell v. Monge action, petitioner described the Amended Employment Agreement and negotiations leading up to the Amended Employment Agreement as follows: The said $ 50,000 payment is to be made in partial discharge of payments owing the plaintiff under the original Employment Agreement of April 21, 1978 * * * The Agreement of September 22, 1980, was an employment agreement between plaintiff, on the one hand and CLC and CLIC (severally), on the other hand, and each of them. *1989 In return for signing such an agreement, Mitchell would receive in full settlement of the six-year period remaining on his employment contract (from mid 1979 to mid 1985), the sum of $ 150,000, payable in installments over a nine-months period, and $ 3,000 per month as an employee/consultant of CLC.
III. Net Operating Loss Carry Back
Leslie Investment Corporation (Leslie) was a corporation formed by petitioner in 1980. During 1980 and 1981, the stock of Leslie was owned 98.7 percent by petitioners and 1.3 percent by their minor children. The assets *711 of the corporation consisted of real property, a proprietary lease, and a limited partnership interest in a dairy operation. In 1980, Leslie was an electing small business corporation under subchapter S. In 1981, Leslie revoked its subchapter S election and became a subchapter C corporation. The Form 1120 filed by Leslie for that year reported a loss of $ 12,320.
In an amended return for 1980, petitioners sought to carry back the 1981 net operating loss of Leslie to Leslie's 1980 taxable year, and to pass through its share of the loss to petitioners' 1980 Federal income tax return. OPINION I. Business Expense Deduction
Section 162(a) provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Petitioner argues that the purchase of the warrant in 1973 for $ 103,500 was an ordinary and necessary business expense under section 162(a) incurred in carrying on his trade or business of being an employee, entitling petitioner to a deduction to be measured by the amount *712 of the premium over market value paid for the warrant. Respondent argues that: (1) petitioner has failed to prove that he paid a premium for the warrant; (2) petitioner has failed to prove that any such premium would be an ordinary and necessary business expense; and (3) the purchase of the warrant was a non-deductible capital expenditure for which any loss must be claimed upon realization. A. Fair Market Value of the Warrant
We conclude that petitioner did not pay a premium over fair market value for the warrant. Petitioner's expert witness, Robert F. Howard, testified and submitted an appraisal report concluding that the value of the warrant as of March 27, 1973, was $ 30,000. Respondent contends that the warrant was worth at least $ 103,500, its purchase price. In valuing the warrant, Howard relied primarily on the future anticipated performance of CLC's common stock. He reasoned that "To attempt to value the Warrant by relating it to the then market price of the Company's common stock or by comparing the ratio of publicly traded warrants to their respective stock prices and relating back to the Company, is not, in our opinion applicable in this particular case. *713 " Howard began with an estimated midpoint of CLC's common stock of $ 4.76 - $ 4.96 per share as of December 31, 1973, and then estimated the future performance of the stock over the next ten years. From these estimates Howard estimated the value of the warrant itself. Howard also took into account his opinion that CLC was "on the verge of bankruptcy." We find Howard's testimony and appraisal unpersuasive due to his failure to take into account the fact that on the day petitioner was offered the warrant the closing price of CLC stock was $ 8.50, and on the date he purchased the warrant the closing price was $ 7.50. During 1973, the highest closing price of CLC stock was $ 9.38. As respondent's expert, Herbert T. Spiro, testified, an investor considering the purchase of the warrant would have taken into account the current and recent values of CLC common stock in valuing the warrant. Had Howard done so, we feel he would have arrived at a much higher fair market value for the warrant. Because of Howard's failure to do so, we reject his estimate of the warrant's fair market value. We also reject Howard's contention that, at the time petitioner purchased the warrant, CLC was *714 on the brink of bankruptcy because of its inability to finance the ITT Hamilton insurance purchase. Specifically, Howard argues that because CLC may have been unable to satisfy the short-term note due ITT Hamilton on March 31, 1973, the future of the company, as well as the value of the warrant, were in doubt. However, we note that petitioner was offered the warrant on February 16, 1973, and the purchase was closed on March 27, 1973. On February 16, 1973, CLC borrowed $ 6,750,000 from Wells Fargo Bank. Thus, at the time petitioner was offered the warrant, as well as when he actually purchased it, CLC had already secured funds to satisfy the short term note due ITT Hamilton on March 31, 1973. Because we have found that Howard's testimony and appraisal report lacks credibility, petitioner has failed to prove that he paid a premium for the warrant. We therefore reject his argument that any such premium is deductible as an ordinary and necessary business expense. B. Ordinary and Necessary Business Expense
However, even if petitioner had paid a premium for the warrant, we reject petitioner's argument that any premium which he may have paid for the warrant was an ordinary *715 and necessary business expense under section 162. While he has established that it was beneficial to CLC, *1990 and to himself as its chief executive officer, that he have an equity interest in the company, he has not established that it was ordinary and necessary for him to pay a premium for such equity interest. C. Nondeductible Capital Expenditure
Finally, we conclude that the purchase of the warrant was a nondeductible capital expenditure. When a capital expenditure is incurred, to the extent that a deduction is allowable, the cost of the expenditure must be recouped under the provisions which permit deduction for amortization, depreciation, depletion, or loss, rather than under section 162(a). See Howard v. Commissioner, 39 T.C. 833 (1963); Clark Thread Co. v. Commissioner, 28 B.T.A. 1128, affd. 100 F.2d 257 (3d Cir. 1938); W. B. Harbeson Co. v. Commissioner, 24 B.T.A. 542 (1931). Generally the purchase of stock is to be considered a capital transaction under section 263 for which no deduction is allowable under *716 section 162(a). Harder Services, Inc. v. Commissioner, 67 T.C. 585 (1976), affd. without opinion 573 F.2d 1290 (2nd Cir. 1977). Petitioner contends, however, that an exception to the general rule exists where the acquisition of the corporation's stock is made necessary in order to assure the corporation's continued existence, citing Five Star Manufacturing Co. v. Commissioner, 355 F.2d 724 (5th Cir. 1966), revg. 40 T.C. 379 (1963). In Five Star Manufacturing Co. v. Commissioner the taxpayer corporation, whose central income producing asset was its license to manufacture and sell an article under a patent held by a third party, found itself in a situation where the patent holder had cancelled the license to the taxpayer, and had attached, through court proceedings, two-thirds of its inventory of finished goods. The corporation had no working capital and no credit. The patent holder would consent to renew the license and release his hold on the corporate assets only if one of the two shareholders was eliminated from any interest in the corporation. The taxpayer therefore purchased the stock of one shareholder *717 and it survived and continued in business. Under these circumstances, the Court of Appeals for the Fifth Circuit concluded that the corporation's expenditures in buying the stock of the shareholder should be considered as ordinary and necessary and deductible under section 162(a), since without such purchase the corporation would have been put out of business. The Fifth Circuit Court of Appeals, author of Five Star Manufacturing Co. v. Commissioner, has limited that case to its own facts and to those extraordinary situations where the purchasing corporation was faced with extinction absent the purchase in question. In Jim Walter Corp. v. United States, 498 F.2d 631, 639 (5th Cir. 1974), the Fifth Circuit held that Five Star Manufacturing Co. did not establish a general principle that a primary business purpose can convert into a deductible expense an expenditure which is a capital transaction in nature and origin. This Court has followed the rationale of Jim Walter Corp v. United States, supra. In Harder Services, Inc. v. Commissioner, supra, the taxpayer corporation repurchased an employee's stock as *718 part of terminating his employment, all of which was done in order to extricate the taxpayer from an unfavorable financial and management situation. The taxpayer, relying on Five Star Manufacturing Co., claimed the right to an ordinary deduction under section 162(a) with respect to the amounts paid to redeem its stock. We refused to extend the authority of Five Star Manufacturing Co. beyond the extreme situation where corporate survival is at stake, and held that the expenditure was capital in nature. Petitioner was in the trade or business of being an employee. Primuth v. Commissioner, 54 T.C. 374, 377 (1970). To be entitled to a trade or business deduction, he must show that his payment of a corporate expense was made to protect his own separate trade or business. Petitioner must also show that his survival as an employee of CLC was at stake. Centel Communications Co. v. Commissioner, 92 T.C. 612, 636 (1989). We conclude that petitioner has failed to establish that he purchased the warrant because his survival as an employee of CLC was at *719 stake. While his investment in CLC was instrumental in obtaining financing for the ITT Hamilton insurance purchase, and was therefore beneficial to both CLC and to petitioner as its employee, petitioner introduced no evidence that such an investment was a precondition to his continued employment by CLC. We therefore hold that Five Star Manufacturing Co. is inapplicable to the instant case, and that the purchase of the warrant was a nondeductible capital expenditure. II. Recognition of Gain on Transfer of the Warrant for Stock Pursuant to Section 83(a)
Respondent determined that petitioner must recognize gain on the transfer of the warrant for CLC stock in an amount equal to the difference between the fair market value of the stock on the date of transfer and the purchase price of the warrant. Respondent's determination that petitioner must recognize gain of the transfer of the warrant for CLC stock is based on his argument that section 1.83-7, Income Tax Regs., applies to the purchase of the warrant, resulting in section 83(a) applying to the transfer of the warrant for stock. Petitioner argues that there was no transfer "in connection *720 with the performance *1991 of services," and section 83(a) is therefore inapplicable. Section 83(a) provides that if, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over the amount, if any, paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. A transfer of property occurs for purposes of section 83 when an employee acquires the beneficial ownership interest in such property. Sec. 1.83-3(a)(1), Income Tax Regs.
*721 A "restriction which by its terms will never lapse" (also referred to as a "non-lapse restriction") is a permanent limitation on the transferability of property which: (1) will require the transferee of the property to sell, or offer to sell, such property at a price determined under a formula; and (2) will continue to apply to and be enforced against the transferee or any subsequent holder. Section 1.83-3(h), Income Tax Regs. A limitation subjecting the property to a permanent right of first refusal in a particular person at a price determined under a formula is a permanent nonlapse restriction. Limitations imposed by registration requirements of State or Federal security laws or similar laws imposed with respect to sales or other dispositions of stock or securities are not nonlapse restrictions. Sec. 1.83-3(h), Income Tax Regs. Thus, such limitations are not taken into account in determining the fair market value of the property received. A. Transfer in Connection with the Performance of Services *722 Section 83 applies only where property is transferred in connection with the performance of services. For purposes of section 83, a transfer in "recognition of" the performance of services is synonymous with a transfer in "connection with" the performance of services. Sec. 1.83-3(f), Income Tax Regs. Petitioner argues that the purchase of the warrant was made solely for investment purposes, and was therefore unconnected with the performance of services to CLC. Respondent contends that the transfer was made for the purpose of insuring the continued performance of petitioner's services as chief executive officer of CLC, and that therefore the warrant was transferred in connection with the performance of services. Whether property is transferred in connection with services is a question of fact. Bagley v. Commissioner, 806 F.2d 169 (8th Cir. 1986), affg. 85 T.C. 663 (1985). The transfer *723 of property is subject to section 83 whether such transfer is in respect of past, present, or future services. Sec. 1.83-3(f), Income Tax Regs. In addition, where property is transferred in connection with services, section 83 is applicable even though the property was purchased at its fair market value at the date of purchase. Alves v. Commissioner, 734 F.2d 478 (9th Cir. 1984), affg. 79 T.C. 864 (1982). We conclude that in the instant case the warrant was transferred in connection with the performance of services. As the proxy statement explaining the issuance of the warrant makes clear, the warrant was transferred to petitioner in order to assure his continuing services as chief executive officer of CLC. Therefore, the transfer was made in anticipation of future services by petitioner to CLC. B. Applicability of Section 83 to a Stock Warrant
With respect to stock options, the regulations provide that if there is granted to an employee in connection with the performance of services an option to which section 421 (relating *724 generally to certain qualified and other options) does not apply, section 83(a) shall apply to such grant if the option has a readily ascertainable fair market value, determined in accordance with the regulations, at the time the option is granted. Sec. 1.83-7(a), Income Tax Regs. For purposes of the regulation, a stock warrant is an option. Pagel, Inc. v. Commissioner, 91 T.C. 200, 205 (1988). Section 421 does not apply to the warrant purchased by petitioner, and it is therefore governed by section 83(a).
Where a stock option is governed by section 83, the person who performed the services realizes compensation upon such grant at the time and in the amount determined under section 83(a). Sec. 1.83-7(a), Income Tax Regs. For options that do not have a readily ascertainable fair market value at the time of grant, the regulations contemplate that the compensation element of the transaction will be held open until the option is exercised or disposed of. If the option is exercised, section 83(a) applies to the transfer *725 of property pursuant to such exercise, and the employee realizes compensation upon such transfer at the time and in the amount determined under section 83(a). If the option is sold or otherwise disposed of in an arm's-length transaction, section 83(a) applies to the transfer of money or other property received in the same manner as it would have applied to the transfer of property pursuant to an exercise of the option. Sec. 1.83-7(a), Income Tax Regs. In order to determine the tax consequences of the *1992 exchange of the warrant for stock, we must first determine whether the warrant had a readily ascertainable fair market value at the time of grant. C. Readily Ascertainable Fair Market Value
Options have a value at the time they are granted, but that value is ordinarily not readily ascertainable unless the option is actively traded on an established market. Section 1.83-7(b)(1), Income Tax Regs. In the instant case the warrant was not actively traded on an established market. *726 If an option is not actively traded on an established market, the option does not have a readily ascertainable fair market value when granted unless the taxpayer can show that all of the following conditions exist: (1) the option is transferable by the optionee; (2) the option is exercisable immediately in full by the optionee; (3) the option or the property subject to the option is not subject to any restriction or condition (other than a lien or other condition to secure the payment of the purchase price) which has a significant effect upon the fair market value of the option; and (4) the fair market value of the "option privilege" is readily ascertainable in accordance with section 1.83-7(b)(3), Income Tax Regs.Sec. 1.83-7(b)(2), Income Tax Regs.
We find that petitioner has failed to establish the fourth condition, that the fair market value of the "option privilege" is readily ascertainable. The "option privilege" in the case of an option to buy is the opportunity to benefit during the option's exercise period from any *727 increase in the value of property subject to the option during such period, without risking any capital. Sec. 1.83-7(b)(2), Income Tax Regs.
In determining whether the value of the option privilege is readily ascertainable, and in determining the amount of such value when such value is readily ascertainable, it is necessary to consider: (1) whether the value of the property subject to the option can be ascertained; (2) the probability of any ascertainable value of such property increasing or decreasing; and (3) the length of the period during which the option can be exercised. Section 1.83-7(b)(3), Income Tax Regs.
In Morrison v. Commissioner, 59 T.C. 248, 260 (1972), this Court held that the option privilege of the warrants before us did had a readily ascertainable value. In so holding, we emphasized the fact that the warrants provided for the receipt of valuable stock by payment of a nominal sum, leading to the conclusion that the warrants, although they had three year terms, would *728 be exercised immediately. In Frank v. Commissioner, 54 T.C. 75, 89-94 (1970), affd. 447 F.2d 552 (7th Cir. 1971), this Court held that the option privilege of the warrant before us did not have a readily ascertainable value. In so holding, we noted the uncertainty in measuring the future prospects for success of the company to which the warrant related. Morrison v. Commissioner is distinguishable from the instant case because the sum which was payable by petitioner for stock of CLC was not nominal. The instant case, we conclude, is comparable to Frank v. Commissioner, in that there existed a great deal of uncertainty in measuring the future prospects for success by CLC. We therefore find that the value of the option privilege was not ascertainable, and as a result the warrant did not have a readily ascertainable fair market value at the time it was granted. Because the warrant did not have a readily ascertainable fair market value at the time it was granted, the compensation element of the transaction is held open until the warrant is disposed of. In the instant case, the warrant was disposed of when it was exchanged for 90,000 shares *729 of CLC stock. We must therefore apply section 83(a) to the transfer of the CLC stock for the warrant. D. Amount of Income Recognized Under Section 83(a)
1. Arm's-Length Transaction
As a preliminary matter we reject petitioner's contention that the exchange of the warrant for stock was not an arm's length transaction, and that section 1.83-7(a), Income Tax Regs., is therefore inapplicable. Because the exchange was approved by the shareholders of CLC, we find that it was conducted at arm's length. 2. "Amount Paid" for CLC Stock
The term "amount paid" refers to the value of any money or property paid for the transfer of property to which section 83 applies. When section 83 applies to the transfer of property pursuant to the exercise of an option, the term "amount paid" refers to any amount paid for the grant of the option plus any amount paid as the exercise of the option. Sec. 1.83-3(g), Income Tax Regs. In the instant case the warrant was not exercised, and therefore the "amount paid" is the $ 103,500 which petitioner *730 paid for the warrant. 3. Fair Market Value of CLC Stock
In order to determine the amount of income which petitioner must recognize under section 83(a), we must determine the fair market value of the 90,000 shares of CLC stock on the date of the exchange. Both parties introduced the testimony *1993 and reports of expert witnesses with respect to such fair market value. As a preliminary matter, we note that limitations imposed by registration requirements of State or Federal security laws or similar laws imposed with respect to sales or other dispositions of stock are not non-lapse restrictions, and therefore such limitations are not taken into account in determining the fair market value of the property received for the warrant. However, in his notice of deficiency respondent reduced the fair market value of the CLC stock 27 percent on account of its lack of registration, which in turn reduced the amount of gain which, according to respondent, petitioner must recognize. Respondent did not argue for a larger fair market value, and therefore a larger deficiency, at trial or in brief. a. Petitioner's Expert
Petitioner's expert witness, Robert F. Howard, began his analysis *731 of the value of the 90,000 shares of CLC stock received in the exchange with the market value of the shares as of May 21, 1976, or $ 393,750 ($ 4.375 per share). Howard then applied three separate discounts in determining that the fair market value of the restricted stock as of May 21, 1976, was $ 22,500 ($ 0.25 per share). Howard first determined that an appropriate discount for lack of marketability of the shares is 35 percent. Such a discount is necessary, Howard concluded, because the shares are not registered. In computing the appropriate discount for lack of marketability, Howard relied in large part on previous opinions of this Court in which we had found a discount for lack of registration to be appropriate. Howard determined the average discount in these cases and used such average in determining the appropriate discount in the instant case. The cases on which Howard relies date as far back as 1942. Howard next determined a blockage discount. Because the share block is substantial relative to the number of shares traded, Howard reasons, an attempt to sell the shares would tend to flood the market and to depress the market price of the shares. Based on his experience *732 in dealing with investment bankers and market makers, Howard arrived at a blockage discount of 10 percent.
Finally, Howard determined that a discount for alienability is appropriate. This discount is not attributable to a restriction on the share block, Howard reasons, but is due to the circumstances under which petitioner received the shares. Howard states that the board of directors of CLC did not authorize the issuance of the shares under its own authority, but instead had the shareholders authorize the issuance. Under these circumstances, Howard states, "we are informed that if Mr. Mitchell attempted to sell the Share Block on May 21, 1976, or shortly thereafter, any shareholder could bring suit to rescind the sale under California common law or Federal securities laws on grounds that the proxy statement was false and misleading." Howard also states that "we are further informed that such a suit would have a good chance of success." Based on these assumptions, Howard concludes that the 90,000 shares had only a speculative value of $ 0.25 per share. We do not accept petitioner's appraisal. First, we reject his method of determining the discount for lack of registration. Any *733 such discount must be determined by examining the specific facts of the instant case, not by reference to past decisions of this Court involving totally different facts. Next, we reject his method of determining the 10 percent discount for blockage. Howard did not provide any specific facts on which to base such a discount. Finally, we reject Howard's conclusion that a discount for alienability is appropriate. Petitioner introduced no evidence which would indicate that such a discount would be appropriate in the instant case. b. Respondent's Expert
Respondent's expert witness, Herbert T. Spiro, also began his analysis with the market value of the 90,000 shares as of May 21, 1976. Spiro then tabulated information from four entities publishing data on the valuation of restricted securities for 1976 (Claremont Capital Corporation, New America Fund, Inc., Source Capital, Inc., Value Line Development Capital Corp.), and arrived at an average discount for restricted securities in 1976 of 27 percent. Spiro then applied the 27 percent discount to the market value of the shares and arrived at a fair market value for the restricted shares of $ 287,437.50. The 27 percent discount *734 took into account any necessary discount for blockage. We conclude that the fair market value of the restricted stock issued to petitioner was $ 287,437.50 as of May 21, 1976, as determined by respondent's expert witness. Having determined the price paid for the warrant and the fair market value of the 90,000 shares of CLC stock, we sustain respondent's determination that the difference between them is taxable to petitioner as ordinary income in 1976.
IV. Exclusion of Damages Received On Account of Personal Injury
Under section 61(a) "gross income" means all income from whatever source derived, unless otherwise provided. Section 104(a)(2) excludes from gross income damages received on account of personal injuries or sickness. "Damages received" means an amount received through prosecution of a legal action based on tort-type rights, or through a settlement agreement entered into in lieu of such prosecution. Sec. 1.104-1(c), Income Tax Regs.
*1994 *735 In the context of a settlement agreement, the availability of the section 104(a)(2) exclusion from gross income depends on the nature of the claim settled, not on the validity of the claim. Seay v. Commissioner, 58 T.C. 32, 37 (1972). This determination is a factual one, and petitioner bears the burden of proving that respondent's determination is erroneous. Rule 142(a). In the absence of an express personal injury settlement agreement, the most important factor in applying section 104(a)(2) is the intent of the payor in making the payment. Metzger v. Commissioner, 88 T.C. 834, 847-848 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988). Petitioner relies on Seay v. Commissioner, supra, in arguing that the $ 100;511 he received from CLC during 1980 are excludable from gross income under section 104(a)(2) as damages for personal injuries. In Seay v. Commissioner the taxpayer made claims against his former employer for breach of contract and personal injuries arising out of the termination of his employment. He received $ 105,000 in settlement *736 of his claims. At the time of the settlement, both the attorney for the taxpayer and the employer's attorney agreed in writing that $ 45,000 had been allocated to the personal injury claim. We held that the taxpayer had shown that $ 45,000 of the payment was made on account of personal injuries and was excludable from gross income under section 104(a)(2). In arguing that the instant case is indistinguishable from Seay v. Commissioner, petitioner relies on the "Principles of Settlement" which he drafted and which state that "of the three payments of $ 50,000 * * * $ 100,000 will be deemed to be in settlement of employee's lawsuit against CLC, CLIC and various officers and directors for compensatory damages for slander and libel * * *." For several reasons we find that the "Principles of Settlement" are insufficient to establish that the payments are excludable under section 104(a)(2). First, we note that the complaint for libel and slander was never served on the defendants. Second, we note that the "Principles of Settlement" were never signed by CLC's attorney or approved by its board of directors. In addition, two members of CLC's board of directors testified that they *737 did not consider the libel action in approving the settlement agreement with petitioner, and stated that they considered the action a mere nuisance suit. Next, we note that the Amended Employment Agreement which was executed pursuant to the settlement agreement refers to the payments at issue as "compensation." We also note that CLC issued petitioner a Form W-2 reflecting the full $ 100,511 in payments as "wages, tips, or other compensation." Finally, in the pleadings for the action which petitioner filed in 1981 for an alleged breach of the Amended Employment Agreement, petitioner declared that in return for signing the settlement agreement with CLC, petitioner was to receive "in full settlement of the six-year period remaining on his employment contract * * * the sum of $ 150,000 payable in installments over a nine-months period." We find that the payments at issue were made in settlement of petitioner's employment agreement, rather than in settlement of the libel and slander action. Therefore, such payments are not excludable under section 104(a)(2), and respondent's determination is sustained. V. Net Operating Loss Carry Back
Congress substantially revised the *738 Subchapter S Internal Revenue Code sections in the Subchapter S Revision Act of 1982. As part of the revision Congress enacted section 1371(b), providing that "[n]o carryforward, and no carryback, arising for a taxable year for which a corporation is a C corporation may be carried to a taxable year for which such corporation is an S corporation," and "No carryforward, and no carryback shall arise at the corporate level for a taxable year for which a corporation is an S corporation." However, section 1371(b) applies to taxable years beginning after December 31, 1982. Thus, section 1371(b) is inapplicable to the years at issue. Petitioners argue that prior to the enactment of section 1371(b) there was no prohibition against the carry back of a net operating loss to a year for which a corporation is an S corporation. Respondent argues that such a prohibition was implicit in section 1374 and the regulations thereunder. Deductions from income are allowable as a matter of legislative grace, and petitioners bear the burden of proving they are entitled to them. Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934); *739 Welch v. Helvering, 290 U.S. 111 (1933). With regard to the inability of a corporation in a subchapter S year to take advantage of a loss generated in a subchapter C year, the regulations provide, in relevant part: Under section 1373(d), an electing small business corporation is not allowed a deduction for a net operating loss. Under section 172(h), a net operating loss sustained in taxable years in which a corporation is an electing small business corporation is disregarded in computing the net operating loss deduction of the corporation for taxable years in which it is not an electing small business corporation. In applying section 172(b)(1) and (2) to a net operating loss sustained in a taxable year in which the corporation was not an electing small business corporation, a taxable year in which the corporation was an electing small business corporation is counted as a taxable year to which such net operating loss is carried back or over. However, the taxable income *740 for such year as determined under *1995 section 172(b)(2) is treated as if it were zero for purposes of computing the balance of the loss available to the corporation as a carryback or carryover to other taxable years in which the corporation is not an electing small business corporation. Section 1.1374-1(a), Income Tax Regs.
Under these regulations, a subchapter S year will be counted as a year for purposes of the carry back and carry forward periods. However, income in the subchapter S year will be regarded as zero, resulting in no part of the net operating loss carry back or carry forward being absorbed. Because no part of the net operating loss carry back is absorbed, no part of the carry back passes through to the shareholders. We agree with respondent that section 1371(b)'s prohibition of a carryback from a C year to an S year was implicit in the regulations prior to the enactment of that statute. We therefore sustain respondent's determination that no part of Leslie Investment Company's 1981 loss passed through to petitioners in 1980, a year in which Leslie Investment Company was an electing small business corporation. In light of *741 the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Though petitioner reported the initial payment of $ 50,511 as compensation on his 1980 Federal income tax return, petitioner now argues that both payments made in 1980, totaling $ 100,511, are excludable from gross income under section 104(a)(2)↩.